<pre>
 1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
 2                            --o0o--

 3   SILICON GENESIS CORPORATION, ) Case No. 22-CV-4986
                                  ) San Francisco, California
 4   Plaintiff/Counterdefendant,  ) July 20, 2023
                                  ) 9:17 a.m.
 5            v.                   )
                                  )
 6   EV GROUP E. THALLNER, GmbH,  ) Re: Motion hearing
                                  )
 7   Defendant/Counterplaintiff.  )


 8                   TRANSCRIPT OF PROCEEDINGS
 9           BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY
                    UNITED STATES DISTRICT JUDGE
10
     APPEARANCES:
11
     For the Plaintiff:      GAW POE, LLP
12                           Embarcadero 4, Suite 1400
                             San Francisco, CA 94111
13                      BY:  MR. MARK WEYLIN POE

14   For the Defendant:      K&L GATES, LLP
                             Four Embarcadero Center
15                           Suite 1200
                             San Francisco, CA 94111
16                      BY:  MR. MATTHEW GORDON BALL

17
                     JENNIFER COULTHARD, RMR, CRR, CSR
18                        Official Court Reporter
                     450 Golden Gate Street, Suite 1600
19                        San Francisco, CA 94102
                          jenrmrcrr2@gmail.com
20                            (530)537-9312

21   Proceedings reported via mechanical steno - transcript produced
     via computer-aided transcription
22

23

24

25
</pre>

| | |
|---|---|
| 1 | **Thursday, July 20, 2023**                                    **9:17 a.m.** |
| 2 | P R O C E E D I N G S |
| 3 | --o0o-- |
| 4 | (In open court.) |
| 5 | **THE CLERK:**  Calling civil action C22-4986, SiGen v. |
| 6 | EVG. |
| 7 | Counsel, please come up to the podium. |
| 8 | **MR. POE:**  Good morning, Your Honor; Mark Poe for the |
| 9 | plaintiff. |
| 10 | **THE COURT:**  Good morning. |
| 11 | **MR. BALL:**  Good morning, Your Honor; Matt Ball from |
| 12 | K&L Gates for the defendant.  New. |
| 13 | **THE COURT:**  New, yes.  Welcome then.  I wanted you to |
| 14 | be here because, of course, discovery closes August 31st, and |
| 15 | so when we're done here, you two gentlemen need to sit down and |
| 16 | map it all out to get it all done. |
| 17 | But first, let's address the motion to dismiss the two |
| 18 | causes of action in the counterclaim. |
| 19 | So I'll give you my tentative -- well, we'll start |
| 20 | with the first -- the first claim, the breach of section 5.5 of |
| 21 | the license agreement, just the plain reading doesn't obligate |
| 22 | SiGen not to receive confidential information.  It just doesn't |
| 23 | do it. |
| 24 | I mean, maybe you have a claim against KPMG; or, if |
| 25 | SiGen's side, a nondisclosure of that, but it's just not there |

1   in the license agreement.

2        MR. BALL:  Well, it sounds like the Court may have

3   made up its mind, but what I would say to that is if you

4   interpret section 5.5 to read out an obligation of SiGen not to

5   access the confidential information, I mean, it seems to me

6   that it does not follow the parties' intent.

7        THE COURT:  Well, the parties can intend whatever they

8   want, but then what we enforce is what's written in the

9   contract.

10        As I said, there's -- you allege that there is a

11   nondisclosure agreement that was signed by EVG and KPMG, so go

12   after KPMG if that's what you think, right?  I can only enforce

13   the con -- I mean, you know that.

14        MR. BALL:  I hear you, Your Honor.

15        THE COURT:  You know that.  And I know you didn't

16   draft the claim, but you know that.

17        MR. BALL:  It doesn't sound like I'm going to make

18   much headway.

19        THE COURT:  Well, I don't know what do you want me to

20   do.  I mean, I'm reading the plain language.  Show me the

21   language that we would instruct a jury to find if they breached

22   it or not.  Just where is it?  I'm looking at it.  What is

23   interesting is your opposition didn't cite the language.

24        It's not there.  Okay.  All right.

25        Now, with respect to the SLAPP motion, how does your

1   counterclaim not breach section -- the one that -- here we

2   go -- prohibits the parties from using, in any proceeding, the

3   fact of the settlement?

4           **MR. POE:**  Well, there are two, Your Honor.  That's not

5   what the language -- what the parties say.

6           **THE COURT:**  Well, let me -- it says, "The parties

7   agree that the terms and existence of this agreement shall not

8   be used in any dispute or proceeding."

9           **MR. POE:**  In my reading, shall not be used or

10  admissible as evidence.

11          **THE COURT:**  Yes, but shall not be used "or."  Shall

12  not be used "or."  So shall not be used in any dispute or

13  proceeding.  How is it you used it in your complaint?  You used

14  it.

15          **MR. POE:**  I want to go back to the language there,

16  Your Honor, and we talk about superfluous language is not found

17  in contracts.  And so if the prohibition was simply "shall not

18  be used," period, without respect to the word "evidence," then

19  the words "or admissible as evidence," would not make any

20  sense.

21          **THE COURT:**  No, no, no.  See, here's your problem is I

22  spent 11 years doing a lot of settlement conferences and

23  helping people negotiate settlements.  And the reason they

24  entered into settlements is they then agree, you know what,

25  nothing can be drawn from the settlement, the fact that we

1   entered into it.  We just did it.

2        And you just took that and threw that out the door and

3   then tried to draw an inference from it, which is actually

4   completely impermissible, completely impermissible.  There is

5   no -- zero inference to be drawn from the fact that a

6   settlement was entered into, number one; and number two, the

7   parties specifically contracted for there to be no inference to

8   be drawn because it wasn't to be used.

9        Now, it's true with respect to their opposition to

10  your SLAPP motion they misstate *Olson* -- not you, because you

11  didn't draft it -- but the brief completely misstates the law

12  and says that the SLAPP law doesn't apply to contract claims.

13  It doesn't say that.

14        And *Olson*, Supreme Court case, did not decline to

15  apply it, but *Olson* did say, we're not going to reach it.  Huge

16  distinction there.  Huge distinction.  You didn't draft it, so

17  I'm not going to make you defend it, but that was a

18  misstatement in that brief.

19        On the other hand, it's also -- what it is, is, you

20  look at it and you say, well, would it be consistent with the

21  policy behind the SLAPP statute to apply here.

22        Here it would not.  Here it's exact opposite.  It

23  cannot be that you can enter into a settlement agreement and

24  say we're not going to use this for any purpose and that you

25  can then go ahead in another proceeding and use it for exactly

```
 1    that purpose.

 2              "I want you, Judge, to draw an inference that they did

 3    something wrong because they entered into a settlement

 4    agreement."  That's the exact opposite -- right? -- and it

 5    can't be that the SLAPP statute protects that.

 6              MR. POE:  I recognize Your Honor's spent numerous

 7    years in settlement conferences assisting me in one of those.

 8              THE COURT:  I did?  Oh, I didn't even remember that

 9    one.

10              MR. POE:  It was a long time ago, 2014.

11              THE COURT:  Wow.

12              MR. POE:  I spent 19 years, not all of which, but

13    negotiating settlements.  And if I were negotiating settlement

14    and I wanted to include a provision that said the parties may

15    not refer to this settlement, I would write, "The parties may

16    not refer to this settlement in any dispute."

17              "Used or admissible as evidence," admissible as

18    evidence must mean something.

19              THE COURT:  No.  Used -- yes.  Used "or."

20              MR. POE:  Right.  But if it were just used, then "or

21    admissible as evidence" would be a complete --

22              Because if you can't use the thing --

23              THE COURT:  Okay.  Here's the thing.  On your

24    motion -- right? -- I have to find that they cannot prevail on

25    this claim as a matter of law.  And I can't find that because
```

1   drawing inferences in their favor in terms of -- this language

2   is susceptible to that interpretation, that that violated it.

3   There we are.  Maybe go to summary judgment and maybe you'll,

4   in your month that you have, you'll take a deposition and you

5   go it's a complete waste of time, but maybe as to what it

6   means, right?  I mean, that's what you two gentlemen can sit

7   here and talk about is actually let's just get to the merits of

8   this case and stop this side show and everyone just paying

9   their lawyers for other things.  But no.  I'm sorry.  I'm

10  sorry.  That language is susceptible and it makes perfectly

11  good sense to me.  And I would not draw that inference.  I

12  don't -- that is not a reasonable inference to be drawn.

13          When someone enters into a settlement, they are not --

14  and that means we're just resolving it.  We're just resolving

15  it as a settlement.  And so I don't even think it supports the

16  claim anyway.  It didn't need to be in there.  But I think it's

17  arguably -- and I can't say it doesn't -- states a violation of

18  the settlement agreement.  What their damages are, I don't

19  know, but that's not before me.

20          **MR. POE:**  It was cited by Your Honor in the order

21  denying the motion to dismiss as facts alleged that supported

22  our claim that there were other unlimited systems, and so I

23  don't know.  At one point it was relied on by the Court as a

24  relevant fact in support of our allegation.

25          **THE COURT:**  But I didn't know about the settlement.  I

1   didn't know about this provision, did I?

2            **MR. POE:**  Well --

3            **THE COURT:**  That wasn't placed in front of me.

4            And if I did, then I was wrong.  Then I was wrong.

5   And if you want me to go back and look at the motion to dismiss

6   and whether I denied it, I'll do that as well.

7            **MR. POE:**  I'm not familiar with that procedure, so --

8            **THE COURT:**  I don't know.  I mean, I don't know.  Then

9   I was wrong.  All I know is what I now have presented to me is

10  their counterclaim for breach of that.  And then you did the

11  anti-SLAPP and then they amended and we did this.  And this is

12  exactly what I warned the parties might happen at the beginning

13  of the case is that it's just going to blow up into something

14  bigger and that, it seems, is what we have, and we need to get

15  back on track.

16           But now explain to me, though, because you have three

17  theories within this claim, right?  One was the breach of a

18  settlement agreement and two was that they are seeking a

19  claim -- they are seeking royalties for products which were

20  released.

21           **MR. BALL:**  Yeah.  That's right.

22           **THE COURT:**  Okay.  Are you seeking royalties on

23  products which were released, so that -- which were -- predate

24  the audit -- sold predating the audit?

25           **MR. POE:**  No.  And that is actually not their

1    allegation.

2         Their allegation is that the settlement released

3    products that were sold through -- was it? -- August 31st,

4    2018, through some date in 2018 --

5         THE COURT:  Yes.

6         MR. POE:  -- and that by -- in the several quarters

7    thereafter, by -- when they would send their royalty reports

8    and they would say "Please send us an invoice for our

9    bookkeeping," when SiGen would send them an invoice -- this is

10   in 2019 -- that conduct is now a breach of the settlement

11   agreement because of the theory that we have now alleged in the

12   second amended complaint.  Now, this is not a theory breach of

13   I've heard before.

14        THE COURT:  Wait.  Just a straight question.  You are

15   not seeking royalties on any products that were sold within

16   your definition of what sold means before that date.  What is

17   that date?  It's a 2018 date.

18        MR. BALL:  I don't have the exact date in front of me,

19   Your Honor, but that's the understanding that I have of the

20   claim is that they are seeking royalties for payments that were

21   made, you know, before the settlement agreement.

22        THE COURT:  Well, no, that were sold.

23        MR. BALL:  Yeah, that was resolved, that should have

24   been resolved in the past.

25        THE COURT:  So that's all I want to know is, are you

1  disavowing any intent to seek royalties on products that were

2  sold under your definition of sold prior to that date?

3       **MR. POE:**  I believe -- now, there is this document

4  EVG165 we refer to it as, a list of the systems that EVG says

5  are at issue.  I believe there is one that has an order date

6  that predates that closing date of -- the end date for the

7  settlement period.

8       **THE COURT:**  And so are you seeking royalties for that

9  part?

10      **MR. POE:**  Yes.

11      **THE COURT:**  Okay.

12      **MR. POE:**  I can tell you the reason, Your Honor.

13      **THE COURT:**  Well, tell me why that doesn't fall within

14  the release of the settlement agreement.

15      **MR. POE:**  Because the settlement agreement is

16  extremely clear that the language of the settlement agreement,

17  the fact of the settlement agreement shall have no bearing on

18  the proper interpretation of the licensing agreement.  It's

19  decided -- it was in footnotes -- I'm not sure if Your Honor

20  saw that, or I could direct you to where it is.

21      **THE COURT:**  Well, I'm reading the release from EVG

22  2.1, "Releases EVG from all claims and liabilities arising out

23  of or relating to products sold before the end of the audit

24  period."  Are you saying it doesn't come within the definition

25  of products?

1          **MR. POE:**  No.  It is a product, Your Honor.

2          **THE COURT:**  So how, under that language, then -- so

3   now I'm just addressing whether they essentially state a claim,

4   right?  How is it that they don't state a claim, then, that you

5   are seeking a --

6          **MR. POE:**  That is not -- you have to -- reading the

7   amended counterclaims, that is not what their allegation is

8   that now in this litigation we are seeking royalties on

9   machines that were released.  I brought the amended

10  counterclaim.

11         So it's paragraph 30 of the amended counterclaims.

12         **THE COURT:**  Yes.

13         By demanding royalties for products that under your

14  definition of sale were sold prior to September 30, 2028.

15         **MR. POE:**  I just wish I had -- apparently it's not

16  referring to in this litigation we are demanding royalties.

17  It's saying by -- it says something about like "subsequently

18  commanded" or something about the invoices in there.  The

19  allegation is that by SiGen sending invoices --

20         **THE COURT:**  Not in paragraph 30.  Do you want to look

21  at it?

22         **MR. POE:**  Oh.  Thank you.

23         **THE COURT:**  It has my work product on it, and I'm not

24  waiving that by showing it to you.

25         (Pause in proceedings.)

1          **MR. POE:**  Right.  You have to go back to --

2          **THE COURT:**  I just have that one page.  The three

3     theories are set forth there in 29, 30 and 31.

4          **MR. POE:**  So it is -- the allegation is cleared up in

5     the factual allegations and I'm just perplexed why I'm not --

6          **THE COURT:**  Well, why don't you tell me, what is your

7     second theory there?

8          **MR. BALL:**  Yeah.  The second theory is that they're

9     seeking royalties for payments that should have been released

10    under the settlement agreement based on the theory of when a

11    sale occurs.  So if there's payments made before the date the

12    release takes effect, they're trying to get royalties for those

13    payments even though they should have been released.  That's

14    the breach.

15         **THE COURT:**  Why isn't that an affirmative defense

16    rather than a claim?

17         **MR. BALL:**  I think it can be both, Your Honor.  I

18    mean, you know, when I was researching this -- and, you're

19    right, the law on the SLAPP and the litigation privilege as

20    applicable to contracts is more nuanced than the briefs say.

21    And there is all kinds of cases that were cited -- well, not

22    me, but Sidley cited a couple of them to you.  You just bring

23    counterclaims based on breach of settlement agreements.  I

24    don't know how common it is, but it certainly happens.

25         **THE COURT:**  I don't even know how it works.  I mean,

1    it sounds to me -- they sound to me more like affirmative

2    defenses.  You're not going to argue that that affirmative

3    defense would be protected by the litigation privilege?

4         **MR. POE:**  On that question -- well, let me revert back

5    to -- it's paragraph 16, Your Honor, that sets forth the facts

6    on which that allegation is based in the amended counterclaims.

7    It says, "Yet, following entering into the settlement

8    agreement, SiGen invoiced EVG for payment of royalties for

9    products that were sold prior to September 30, 2018, under

10   either of SiGen's current theories of sale.

11        "Based on the inconsistent definition of sale that

12   SiGen has taken in this case, SiGen breached section 2.1 of the

13   settlement agreement by demanding and obtaining improper

14   royalty payments or transactions that were paid for and

15   released under the settlement agreement."

16        That's my point that the allegation -- I mean, I

17   suppose we could verbally say what the allegation is now, but

18   as it's written here in the second amended complaint, the

19   allegation is not that this lawsuit constitutes a breach of the

20   settlement agreement.  The allegation is that back in 2019,

21   when Mr. Fong and his staff sent invoices, that now under our

22   current theory, what happened in year four means that something

23   in year one is --

24        **THE COURT:**  Okay.  All right.  Fine.  Then that's not

25   covered by the SLAPP statute because it's not protected

```
 1  activity.
 2          MR. BALL:  That's right.
 3          MR. POE:  No, it's absolutely.  They do not contest
 4  it's protected activity, and it's based on the allegations in
 5  our complaint.
 6          THE COURT:  No.  You just said it's based on an
 7  invoice --
 8          MR. POE:  No.
 9          THE COURT:  -- that was sent in 2019 --
10          MR. POE:  No.
11          THE COURT:  -- that's not protected activity --
12          MR. POE:  No, no.
13          THE COURT:  -- under your definition of sold.
14          In any event, none of that falls within the SLAPP
15  statute and what it's supposed to be protected against.
16          Now, your paragraph 29 theory, though, makes zero
17  sense to me at all.
18          MR. BALL:  Yeah.  So --
19          THE COURT:  That's just referring to an argument that
20  they made in there.  It's not even really a claim for breach of
21  contract.
22          MR. BALL:  Well, no.
23          THE COURT:  Let's just cut through this for a moment,
24  because I really -- we have new counsel in here now -- it's a
25  new day -- let's see what we can do.
```

1          Because, by the way, in federal court with a SLAPP

2    statute you grant with leave to amend if you grant anyway,

3    right?

4          So this is what I think you should do:  I don't think

5    any of these really are breach of contract claims.  They're

6    actually affirmative defenses.  That's actually -- you just

7    want to be protected.  If they're seeking royalties on products

8    that were released, you have that defense that they were

9    released.

10         And, I don't know, with respect to the breach of the

11   settlement agreement, they can agree to take it out of their

12   complaint.  It doesn't change anything because there's no

13   inference to be drawn from it in any event, right?  And then

14   let's move on.  And then let's just move on.

15         So I think that's what you should talk about.

16         Or you can amend your complaint and try again.  To

17   what end?  Zero end.  Zero end.  There's nothing to be gained

18   for it.  If it's just an affirmative defense, that's fine.

19         Again, you're not about to claim that they can't put

20   release as an affirmative defense, right?

21         **MR. POE:**  I assume they already have.

22         **THE COURT:**  Yeah.  Exactly.  So it can all just be

23   fixed.  It can all just be fixed.  And so let's figure that

24   out.  And then -- so that's what I'm going to do.  I'm going to

25   grant the motion to dismiss with leave to amend, and then I

 1   want you guys to figure out what comes next.

 2          **MR. BALL:**  So that would be on the breach of the

 3   settlement agreement theory as well?  I'm not sure that that

 4   was substantively moved on.  It was a SLAPP theory only is my

 5   understanding of the briefing on the second cause of action in

 6   the counterclaim.

 7          **THE COURT:**  I'm just doing it because you didn't write

 8   it.  It's not clear actually what it is.  I don't know what

 9   your damages would be from it.  In any event, I don't want it

10   to go through and because I think it's all extraneous and a

11   waste of time.

12          **MR. BALL:**  I understand Your Honor's point.

13          **THE COURT:**  Right?  But if you want to do it again

14   where you draft it, you can.  I'm granting you leave to amend.

15          What I'm suggesting is, it might be better spending

16   your client's time to actually make sure you have affirmative

17   defenses with a real defense.  We can all agree that the

18   mention of the settlement agreement has no effect in this case.

19   And let's get on to actually having me adjudicate what sold

20   means -- right? -- which would resolve it all one way or the

21   other.

22          **MR. BALL:**  I mean, Your Honor is not wrong.

23          **THE COURT:**  Okay.

24          **MR. BALL:**  I understand where you're coming from, and

25   it's choose your own adventure time for me, and I'll take what

```
 1   Your Honor says --
 2               THE COURT:  Okay.
 3               MR. BALL:  -- into consideration very carefully.
 4               THE COURT:  All right.
 5          So that's just what I'm going to do.
 6          But the first claim I'm actually not granting leave
 7   to -- well, no, I think I have to, but I don't see how 5.5 is
 8   viable here, but I'll grant leave to amend.  You can come up
 9   with something.  I don't know.
10          Now let's talk about discovery.  I did an order and
11   they complied with it or are complying with it?
12          MR. BALL:  There is some disagreement on that, Your
13   Honor.  And I regret to say there another letter being drafted
14   right now.
15          THE COURT:  No.  No letter being drafted.  This is why
16   I made you come today.  You're going to go to the 18th floor
17   lounge and you guys are going to sit there and work everything
18   out.
19          And also, you're also going to figure out, because
20   discovery closes August 31st and I'm not moving that date, sit
21   there and plan everything out:  When your depos are going to
22   be, what the depos are going to be, where they're going to be,
23   how they're going to be.  And then by a week from tomorrow, I
24   want you to submit a stip to me that tells me what your
25   discovery schedule is for getting it all done.  And then if you
```

1    still have a letter in there, then you do that, but not until

2    you guys now sit face to face and figure it out.

3           **MR. POE:**  Mr. Ball and I have met and conferred a

4    couple of times.  We have a good rapport.

5           There are two issues that will require guidance from

6    your counsel, and they're very simple.  EVG was required by the

7    30th of last month to produce all of its invoices, if you

8    recall.  It produced the invoices, but they are redacted.

9           There's a protective order in this case, and of course

10   there's a list of cases as long as my arm saying that a party

11   can't unilaterally redact documents.  I have three examples

12   here.  This is one where we're at loggerheads.

13          EVG believes -- you recall they want this AEO

14   designation that's been -- was ruled against twice.  They are

15   standing on the ground that they are not going to turn over

16   unredacted invoices even though they were ordered to do so.

17          If there was an argument in that last letter about,

18   well, we could turn them over but we need to redact them, it

19   could have been addressed then.  They were just ordered to

20   produce them by the 30th.  They haven't.  So I think that could

21   easily be ruled on.

22          **MR. BALL:**  And, Your Honor, no, it cannot.  The things

23   that we redacted are irrelevant trade secrets, and we would

24   definitely want to make that showing to Your Honor before Your

25   Honor --

1          **THE COURT:**  Well, I think you're going to have to move

2     for reconsideration.

3          **MR. BALL:**  Of what, Your Honor?

4          **THE COURT:**  Well, I think, as Mr. Poe says, I did an

5     order with respect to that.  I mean, I don't know.

6          **MR. POE:**  There was -- it was -- their request for an

7     AEO was twice now.

8          **THE COURT:**  But -- but let me just say this:  You

9     better need the information that they're redacting, right?

10          **MR. POE:**  Yes, Your Honor.

11          **THE COURT:**  Because it's not a game.

12          **MR. POE:**  Right.

13          **THE COURT:**  And it may be that they're redacting it

14     and you're correct that they shouldn't be, but if you actually

15     don't need that information, then, again, then let's not do it.

16          So why can't it be AEO at least?

17          **MR. BALL:**  It can.  It absolutely can.

18          **THE COURT:**  So why is --

19          **MR. POE:**  It cannot be, and we went over this in those

20     prior motions.

21          **THE COURT:**  No, no.

22          **MR. POE:**  Mr. Fong, who is here, he could explain this

23     if this were an evidentiary hearing, but because I don't know

24     anything about the industry, Mr. Fong says that he will note

25     immediately upon seeing these customer names what proper

1   classification for tiers of royalty that because of the

2   industry --

3          **THE COURT:**  Okay.  All right.  I already ruled on the

4   AEO thing.  It was presented to me in some way and --

5          Yeah.  And have you read those orders?

6          **MR. BALL:**  Yes, I have, Your Honor.

7          **THE COURT:**  Did you read the briefing?

8          **MR. BALL:**  Yes, I read the briefing.

9          **THE COURT:**  Well, then tell me how you get AEO when I

10  said you hadn't made a showing for it.

11         **MR. BALL:**  Because that was a blanket AEO.  They were

12  going for a blanket AEO designation that they could just do

13  willy nilly.

14         What I'm telling the Court is, is that these are super

15  sensitive trade secrets.

16         **THE COURT:**  Well, then you'll have to move for

17  reconsideration --

18         **MR. BALL:**  That we know sensitive information --

19         **THE COURT:**  -- and tell the Court why the argument

20  you're making could not have been made before, because you

21  don't get a do-over just because new counsel came in because I

22  don't have time to just do things over and over and over again.

23         I took seriously what was presented to me at the time

24  how it was presented, and if it wasn't presented properly,

25  their client's just going to have to live with it.

```
 1          MR. BALL:  I will take a look at that and I will
 2   review the briefing again just to make sure the procedural
 3   history is that.
 4          And how would the Court want us to report back, I
 5   guess, is it in a letter format or a motion for reconsideration
 6   under the local rules?
 7          THE COURT:  I think you'd have to do a motion --
 8          MR. BALL:  What's the Court's preference?
 9          THE COURT:  -- for reconsideration, but I think you'd
10   have to do it as a letter brief because August 31st is our
11   discovery deadline.
12          MR. BALL:  Yeah.
13          MR. POE:  Well, and that's a problem for us, not for
14   them, right, because we're the ones that are wanting to get the
15   documents post haste so that, for example, if there are
16   customers who we need to send subpoenas to that we have time to
17   do that.  But if now we're going to be --
18          THE COURT:  Well, before you subpoena one of their
19   customers, you're going to have to come through me.
20          MR. POE:  Okay.
21          THE COURT:  Because that is something that can be very
22   harmful, and I'm mindful of that.
23          MR. POE:  Okay.
24          THE COURT:  And I do not allow litigation to have that
25   sort of collateral consequence unnecessarily.
```

1          **MR. POE:**  Okay.

2          **THE COURT:**  So you need to tell me and specifically

3  why you would need to do that.

4          I don't know why you would need to do that.  Why can't

5  I just decide what sold means first?  That you don't need that

6  customer information.  So maybe what we need to do is to

7  bifurcate discovery in some way.

8          **MR. POE:**  Bifurcate discovery?  I mean, that would

9  really -- I mean, I suppose we could.  That would really extend

10  the schedule, I suppose.

11          **THE COURT:**  Right.  I know.  I understand.  I'd have

12  to do that, but --

13          **MR. POE:**  Which we're not -- we're not eager to do.  I

14  mean, my -- like I said --

15          **THE COURT:**  I'm not eager to do it either, but it

16  would avoid this problem, because you don't need that in order

17  for me to adjudicate what sold means, correct?

18          **MR. POE:**  That's right.  Like I say, I mean, our view,

19  Your Honor, is that they were ordered to produce them and

20  they're like, all right, he can have half of them.

21          And we also want to file another motion once we --

22          I feel like everyone will have better, like, clearer

23  and we'll need to come back to Your Honor fewer times if we

24  just, like, very squarely follow, you know, the rules and Your

25  Honor's orders, and they were ordered to produce them and they

 1   haven't.

 2          **THE COURT:**  I understand, but the plaintiff and the

 3   defendant are competitors.

 4          **MR. BALL:**  Yep.

 5          **MR. POE:**  In an extremely narrow sense.  SiGen is not

 6   a manufacturer of --

 7          **THE COURT:**  I understand.  I understand, but --

 8          **MR. POE:**  They're in the same industry.

 9          **THE COURT:**  -- you told me that you don't need it to

10   address the question of what is sold, so I don't know.  Why

11   don't you two just go talk?  We have new counsel here.

12          **MR. POE:**  I understand.

13          **THE COURT:**  This case has been so disappointing to me,

14   and you had Mr. Robbins, right?

15          **MR. POE:**  Your Honor --

16          **THE COURT:**  I mean, a big time -- big firm partner who

17   spent a lot of time, and he tried.

18          **MR. POE:**  With permission of EVG's counsel, I would be

19   very happy either to share the parties' settlement positions or

20   have Your Honor talk to Mr. Robbins about why --

21          **THE COURT:**  I don't want to do that, which is another

22   thing I wanted to ask is whether you want me to send you to a

23   magistrate judge.

24          **MR. BALL:**  I think any kind of mediation -- I mean, I

25   trust that Your Honor saw in our statement that Mr. Robbins or

1   maybe Your Honor knows that Mr. Robbins has rejoined the DOJ

2   and so, you know, I've tried to catch up with him, but with the

3   transition he's been very busy.

4        I think this case would benefit from either being sent

5   to a magistrate judge or the appointment of another mediator

6   definitely.

7        **THE COURT:**  I'm not going to appoint another mediator.

8   I'd send you to a magistrate judge at this point with no

9   deadline, and then you guys will talk to the magistrate judge

10  and he or she will decide what is the appropriate time.  And so

11  it may be much later.  I don't know.

12       **MR. POE:**  There's one other discovery issue.  We

13  fairly met and conferred over it and some guidance will help,

14  Your Honor.  You might remember -- and I spent six hours on a

15  plane last night but -- so if you could just give me a

16  minute -- if you remember the second time we met -- I think

17  this was in February at the second hearing -- Mr. Bettinger,

18  Sidley Austin attorney -- they said they were going to produce

19  the email.  They haven't produced any.

20       Mr. Bettinger said, well, we asked our client to send

21  us email and they didn't send any, so I guess they don't have

22  any.  And Your Honor said that's not how discovery works.

23       They have now produced email -- and this is on that

24  question of whether they have produced their internal email or

25  only their external email.  I have some statistics.  EVG has

1    produced 3,069 emails.  Of those, 3,044 were exchanged with a

2    SiGen email address.  A total of 25 internal emails have been

3    produced.  Those 25 are all in the form of an email between

4    someone in sales administration called Martina Colby and the

5    sales director at EVG called Herman Waltl where she says,

6    "Permission to send this royalty report to SiGen?"

7              And he says "Yes," in German.

8         **THE COURT:**  So you believe they have not produced all

9    the emails?

10         **MR. POE:**  They have not produced anything besides

11   these 25 unless we are to believe -- because these -- the

12   emails, the 3,044 between SiGen and EVG, they span 20 years.

13   Unless we are to believe that there was no internal email ever

14   sent that used the word SiGen over 20 years except for these 25

15   where she asked permission, well, then the answer is obvious.

16              And I know we received supplemental RFP responses

17   where EVG purported to describe what had been done.  I know

18   that if we asked Mr. Ball, he will say that he doesn't have

19   personal knowledge of that.  He'll say, well, that's what I

20   heard from Sidley, and so that's what I've said.

21         **MR. BALL:**  No.

22         **THE COURT:**  Okay.  All right.  Mr. Ball, this is what

23   I want you to do:  You -- I am personally tasking you with

24   verifying what was run and make sure every one of those emails

25   has been produced.  And I will told you responsible if they're

1  not produced.  Not if it hasn't been produced up to now.

2  There's new counsel come in and you make sure because that

3  is -- does seem odd.  Could be possible, but you need to -- and

4  maybe have them rerun it.

5         MR. BALL:  I understand, Your Honor, but what I'd like

6  to say is I have discussed this thoroughly with my clients and

7  what they say is that their IT department went in and searched

8  three email in boxes for SiGen, and this is what the results

9  were.  That's what the search was.

10        THE COURT:  And are those -- and which custodians did

11 they search?

12        MR. BALL:  That was the three executives, Herman

13 Waltl, Paul Lindner and Werner Thallner who were the key

14 players in terms of dealing with SiGen on license issues.

15 They've been the key players the whole time.

16        THE COURT:  Okay.  That's what your client told you?

17        MR. BALL:  That's correct.

18        THE COURT:  Okay.  Have you seen that?  Did you talk

19 to IT?  Did you see what they actually ran?

20        MR. BALL:  I have not -- I have not spoken to their IT

21 department, and I can do that, Your Honor.

22        THE COURT:  I would encourage you to do so because I

23 do think -- right? -- I think that's our obligations as

24 counsel, especially with such a long-running relationship it

25 does seem odd, so -- and if that's the case, then I would

1  expect you to have some explanation then.  Your client would

2  have some explanation for why there isn't.

3       **MR. BALL:**  They do the discussions orally.  They sit

4  right next to each other in their offices and when they have a

5  discussion about the SiGen license, they're all right there.

6       **THE COURT:**  Okay.

7       **MR. BALL:**  That's what -- that's the explanation.

8       **THE COURT:**  All right.  Well, just verify that then.

9  Just verify it.

10      **MR. BALL:**  Just so I can comply with that, I mean, I

11 had them on cross-examination with my clients on this issue.

12 I'm pretty sure that this is true.  So, I mean, I don't know

13 what else the Court wants me to do, but I'm happy to do it.

14      **THE COURT:**  All right.  And have they signed a

15 verified document response in which they have attested under

16 oath that they have produced everything?

17      **MR. BALL:**  I always get confused about this, Your

18 Honor, but my understanding is, is that I don't believe RFP

19 responses are verified in federal court.

20      **THE COURT:**  I think that's right.  But I think in this

21 particular case, given the uniqueness of the response, that

22 that would probably be appropriate.

23      **MR. BALL:**  We are happy to do that.

24      **THE COURT:**  And I think if they do that, then they do

25 that.

1              **MR. BALL:**  We are happy to do that, Your Honor.

2              **MR. POE:**  And of course from my experience when a

3     search is run there's something like a hit report, a document

4     report.  If that hit report is verified and it tags 25 hits

5     over 20 years, there is nothing I can do.  Seems a little odd

6     in 20 years no ones going to send an email because they sit

7     next to each other.

8              **THE COURT:**  It depends because they sit next -- maybe

9     they don't.  I mean, I don't know how old they are.  Maybe they

10    don't use email.

11             **MR. POE:**  Not that old, Your Honor.

12             **THE COURT:**  I mean, I don't know.  You know, a lot of

13    people -- why do these companies actually they get rid of email

14    and they get the -- what is it, the stuff that disappears.

15             **MR. BALL:**  Yeah.

16             **THE COURT:**  People are learning email is not good.

17             **MR. POE:**  It's horrible, but they've kept 20 years of

18    communications with SiGen, so that would be --

19             **THE COURT:**  Well, because they can't talk to SiGen

20    because they're not sitting next to them, so that's perfectly

21    logical.  Mr. Ball will confirm that that's the case.

22             **MR. BALL:**  Yep.

23             **THE COURT:**  And they will attest under oath if that's

24    that.

25             **MR. BALL:**  That's right.

1          **THE COURT:**  Then that's that.

2          **MR. BALL:**  That's right.  And as I said to Mr. Poe,

3    you know, he's free to explore that in the depositions with all

4    of them.

5          **THE COURT:**  Okay.  So I -- with respect to the AE, I'd

6    go back and look at that orders, but those orders are what is

7    governing right now, I would say.  And so if what I ruled was

8    that they hadn't made the showing as to AEO, then they hadn't

9    made the showing as to AEO, and then you would need to move for

10   reconsideration.

11         **MR. BALL:**  Okay.  I just want to just emphasize that

12   these are not only the trade secrets of EVG, they are the trade

13   secrets of all of EVG's customers.  This is the supply chain

14   for the most popular consumer products in the world.  There are

15   NDAs that are just mind numbing --

16         **THE COURT:**  You don't need to argue it now because I

17   had a motion on it.  So you can go back and look at it.  You

18   chose to come into the case as the case stands based on what

19   happened, and so there we are.

20         And there's a certain standard that applies to

21   reconsideration.  I know you know what that is, and I know you

22   won't bring the motion if it can't be met.  And there's always

23   other alternatives if your client doesn't like that.  So there

24   we are.

25         But what I do want is by next Friday, then, you guys

1   to give me a stipulation that identifies through August 31st

2   what depo is happening, who's being deposed, whatever

3   additional written discovery there is that needs to be done.

4   We need to cap on this.

5          **MR. POE:**  And I'll just say that hasn't been a

6   problem.  We've already scheduled a number of depositions, so

7   that's not an obstacle.

8          **THE COURT:**  Okay.  I just want to know because I just

9   feel like it's -- yeah.  I just want to know.

10         **MR. POE:**  Don't worry about a thing.

11         **THE COURT:**  I want to --

12         **MR. BALL:**  We got that part, Your Honor, I think.

13         **THE COURT:**  All right.  Don't worry about a thing.

14         **MR. BALL:**  Uh-huh.

15         **THE COURT:**  Great.  And I am going to refer you to a

16  magistrate judge.  He or she will contact you, they'll set up a

17  call and you can talk to them freely about what timing you

18  think would be good or not good, you know, what happened

19  before, where things are and all of those kinds of things.

20         **MR. BALL:**  Okay.

21         **THE COURT:**  If you -- if you -- yeah.

22         All right.  And then do we have a next date here?

23         **MR. BALL:**  Boy.  Not that I know of, Your Honor.  I

24  don't think so.

25         **THE COURT:**  We should probably -- maybe I should check

```
 1   in with you at the end of August by video.

 2          MR. POE:  Sure.

 3          THE COURT:  Unless you have disputes, then I may make

 4   you come.  I do think it's important once in awhile to meet

 5   face to face.

 6          MR. POE:  This was productive.  Thank you.

 7          THE COURT:  Why don't we do -- I think is it August

 8   31st?

 9          THE CLERK:  31st.

10          THE COURT:  At 1:30 by video with a statement one week

11   in advance.

12          MR. BALL:  Okay.

13          THE COURT:  Okay.  Good luck.

14          MR. POE:  Thank you, Your Honor.

15          MR. BALL:  Thank you, Your Honor.

16       (Concluded at 10:07 a.m.)

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3      I certify that the foregoing is a true and correct

 4   transcript of the record of proceedings in the above-entitled

 5   matter.

 6

 7

 8   _____      July 27, 2023

 9   JENNIFER L. COULTHARD, RMR, CRR                DATE
     Official Court Reporter
10   CA CSR#1445

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```