# PATENT LICENSE AGREEMENT

This PATENT LICENSE AGREEMENT (this "Agreement") is made by and between EV Group E.Thallner GmbH, an Austrian corporation, and Silicon Genesis Corporation, a California corporation and shall be effective as of the Effective Date.

# BACKGROUND

A.     Silicon Genesis Corporation owns or controls certain technology and intellectual property rights relating to plasma activated bonding;

B.     EV Group E.Thallner GmbH is in the business, among other things, of manufacturing and distributing production wafer bonding equipment; and

C.     EV Group E.Thallner GmbH desires to incorporate SiGen technology into its wafer bonding equipment for sale.

In consideration of the covenants, conditions, and undertakings hereinafter set forth, it is agreed by and between the parties as follows:

## 1.     DEFINITIONS

1.1     "Affiliate" means any corporation, association or other entity which directly or indirectly Controls, is Controlled by or is under common Control with the party in question, provided, however, that any such corporation, association or other entity shall be deemed an "Affiliate" only as long as such Control exists.

1.2     "Compatible Products" means Products for the practice of the SiGen PAB Process that provide plasma-activated bonding capabilities compatible with SiGen's layer-transfer-process and meet at least the requirements set forth in Exhibit B hereto.

1.3     "Competing Business" means the development, manufacture, and sale of Products or other wafer bonding equipment.

1.4     "Conceived" and "Conception" has the meaning as applied under applicable United States patent law.

1.5     "Confidential Information" means (a) all SiGen PAB Know-How Deliverables, which shall constitute the Confidential Information of SiGen, and (b) any proprietary or confidential information or material, including trade secrets technical information, processes, techniques, algorithms, computer programs, designs, schematics, drawings, formulas, data, development plans, strategies, forecasts, and other technical, engineering, financials, or marketing information, in tangible form disclosed hereunder that is marked as "Confidential" at the time it is delivered to the receiving party, or, if disclosed orally hereunder, which is identified as confidential or proprietary when disclosed and such disclosure of confidential information is confirmed in writing (or by facsimile or email) within thirty (30) days by the disclosing party;

*provided, however,* that Confidential Information shall not include, to the extent the receiving party can establish by competent written proof, information that:

      1.5.1   was already known to the receiving party, other than under an obligation of confidentiality owed to the disclosing party, at the time of disclosure;

      1.5.2   was generally available to the public or otherwise part of the public domain at the time of its disclosure hereunder to the receiving party;

      1.5.3   becomes generally available to the public or otherwise part of the public domain after its disclosure and other than through any act or omission of the receiving party in breach of this Agreement;

      1.5.4   is independently developed by the receiving party without reference to any Confidential Information disclosed by the disclosing party; or

      1.5.5   is subsequently disclosed to the receiving party by a person other than the disclosing party without breach of any legal obligation to the disclosing party.

    1.6   "Control" means:

      1.6.1   as to an entity, the direct or indirect ownership of at least fifty percent (50%) of the outstanding voting shares, or other voting rights to elect a majority of the directors (or comparable officials), of the subject entity;

      1.6.2   as to third party Confidential Information, patents, patent applications, or other patent rights, and Intellectual Property Rights, the possession of the right and ability to disclose and grant the licenses or sublicenses of and within the scope granted herein and otherwise as provided for herein without violating the terms of any agreement or other arrangement with any third party;

      1.6.3   as to the prosecution of patent applications, the maintenance of patent rights, and the enforcement and/or defense of patent rights, "Control" means the sole right to take, initiate, maintain and otherwise control any action relating to the foregoing and includes, without limitation, the authority to select legal counsel, solicit other expert advice and assistance, and to make decisions pertaining to the conduct of patent prosecution, interferences, patent issuance, maintenance, reissue, reexamination, patent enforcement or defense, as applicable.

    1.7   "Distributor Sublicensee" has the meaning set forth in Section 2.1.3

    1.8   "EVG" means EV Group E Thallner GmbH and any entity that is an Affiliate as of the Effective Date (but only for so long as it remains an Affiliate).

    1.9   "EVG Competitor" means ███████████████████████ ██████████████████ ████ ████████████, and any entity Controlled by any of the foregoing.

1.10    "EVG Competitor Successor" means any entity that acquires all or substantially all of the assets of, or merges or otherwise combines with, an EVG Competitor.

1.11    "Effective Date" means the date of last signature by the undersigned on the signature page hereto.

1.12    "Intellectual Property Rights" means copyrights, moral rights, trade secret rights and rights with respect to know-how. "Intellectual Property Rights" does not include (i) any patents, patent rights and rights relating thereto, and (ii) trademark rights, service mark rights and similar rights relating to indicia of source or origin and rights relating thereto.

1.13    "Jointly Owned PAB Technology" has the meaning set forth in Section 6.1.1(c).

1.14    "LIBOR" means the London Interbank Offered Rates rate for U.S. Dollar denominated accounts for a one month period, as published from time to time in The Wall Street Journal.

1.15    "License" has the meaning set forth in Section 2.1.

1.16    "MEMS" means micro-electrical-mechanical systems.

1.17    "Net Sales" means the selling party's cash, cash equivalent or other forms of consideration actually received from the sale of a product, less taxes (including any sales, use, excise or similar taxes, tariffs, or other governmental charges) paid in connection therewith (excluding any taxes based on income), shipping costs (including insurance, duties, and other transportation costs) to the extent actually stated, and credits for returns, refunds, defects, replacements or bad debts actually taken. To the extent any taxes (including any sales, use, excise or similar taxes, tariffs, or other governmental charges) paid in connection with the sale of a product (excluding any taxes based on income) are subsequently refunded to the selling party, such taxes shall constitute Net Sales upon receipt of such refund. Net Sales excludes revenue received in respect of maintenance and support, or other service agreements, other than manufacturer warranties included as part of the original sales price, but only to the extent that such revenue can fairly and reasonably be deemed consideration for such services and not for the sale of the product; it being understood that any cash, cash equivalent or other forms of consideration actually received in consideration for any initial warranty relating to a product shall constitute Net Sales to the extent that such consideration is attributable to the first twelve (12) months of the duration of such initial warranty. If any product is sold to an Affiliate or in an arrangement that is not an arm's-length merchant market transaction, and the price of the product is less than the price in an average arm's-length merchant market transaction with an unaffiliated entity, then "Net Sales" with respect to such transaction shall be based upon the fair market price in an average arm's-length merchant market transaction with an unaffiliated entity; provided that sales to an Affiliate for demonstration and marketing use rather than for production use by such Affiliate shall not give rise to any "Net Sales." If a product is sold in a bundle with other goods or services that (i) are also sold separately on a stand-alone basis, and (ii) provide a separate function when used on a stand-alone basis or together with goods other than such product, the Net Sales from the sale of such bundled product shall equal the Net Sales from the sale of such bundle in its entirety multiplied by a fraction, the numerator of which shall be the retail price of

such product marketed or provided stand-alone, and the denominator of which shall be the cumulative sum of the retail prices of each component good or service of such bundle (including such product) marketed or sold separately; provided that the fair market value estimation of retail value shall be used where no actual retail price is available. By way of clarification and example, if EVG markets a Product in a bundled package with another product (that meets the requirements set forth above and that is not itself a Product), and the retail value of the Product sold separately is the same as the retail value of the other product sold separately, then half of the Net Sales shall be deemed to be from the Product, and the other half shall be deemed to be from the other product. For the avoidance of doubt, where the goods in such bundle other than Products do not meet the requirements set forth above (i.e., they are not sold separately on a stand-alone basis or do not provide a separate function when used on a stand-alone basis or together with goods other than the Product included in such bundle), or where all the goods in a bundle are Products, Net Sales shall be calculated based on the full consideration for the sale of such bundle in its entirety. Notwithstanding anything to the contrary herein, a Product that incorporates or otherwise includes subsystems or other components on a single frame (where at least one (1) such subsystem is a wafer transfer and wafer edge alignment subsystem or a cleaning, drying, and bonding subsystem) shall be deemed to be a Product in its entirety (including such subsystems and other components), and such Product shall not be deemed to be bundled with such subsystem or other components for purposes of this Section 1.17, provided that such Product (including such subsystems and other components) may be bundled with other products on other frames.

    1.18   "Post-Termination SiGen Product" has the meaning set forth in Section 11.5.1.

    1.19   "Product" means any of the following tools or products:

        1.19.1  a plasma enabled bonding system having a plasma activation chamber and one or more of the following: (a) a wafer transfer and wafer edge alignment subsystem, or (b) a cleaning, drying, and bonding subsystem;

        1.19.2  a non-integrable stand-alone plasma activation system; and

        1.19.3  an integrable plasma activation system, but limited to a system that is capable of being integrated into an existing bonding system that was first sold by EVG prior to the Effective Date.

    1.20   "Reduced To Practice" and "Reduction To Practice" has the meaning as applied under applicable United States patent law.

    1.21   "Royalty Bearing License" has the meaning provided in Section 1.28.

    1.22   "SOI" means silicon-on-insulator.

    1.23   "sale," "sell," or "sold" means the sale, lease, conveyance, distribution or other transfer for consideration of a good or a service.

    1.24   "SiGen" means Silicon Genesis Corporation.

1.25    "SiGen PAB Know-How" means the know-how and other information of SiGen (including, without limitation, any third party know-how or other information in which SiGen Controls the Intellectual Property Rights) used in or relating to the SiGen PAB Process.

1.26    "SiGen PAB Know-How Deliverables" means any SiGen PAB Know-How in SiGen's possession as of the Effective Date (a) that is provided by SiGen under this Agreement, (b) that, as of the Effective Date, (i) is owned by SiGen, or (ii) is Controlled by SiGen, but, with respect to SiGen PAB Know-How owned by a third party that is not a SiGen Affiliate, only to the extent that the grant of the licenses granted herein, delivery to FVG thereof, or use by FVG within the scope hereunder does not result in an obligation of SiGen to pay royalties or other consideration to any third party that is not a SiGen Affiliate, and (c) that is reasonably useful or necessary for the manufacture of the Products, including maintenance and repair thereof. Subject to the foregoing, SiGen PAB Know-How Deliverables includes, without limitation, technical and non-technical data, documentation and information relating to the results of tests, assays, and methods and processes that meet all of the foregoing criteria, including, for example, data establishing bond strength achieved for particular starting materials (e.g., Si to SiO2 bond) and annealing conditions, and all base line recipes for plasma activation process of any relevant materials, including full process conditions and identifications of materials used. For the avoidance of doubt, SiGen PAB Know-How Deliverables do not include any SiGen PAB Patent Rights.

1.27    "SiGen PAB Process" means SiGen's proprietary process of plasma activated bonding, pursuant to which pre-bond surfaces are exposed to gas plasma for surface cleaning, activation of surface bonds, and other beneficial actions to form high-integrity bonded interfaces for fabrication of SOI wafers or other laminated structures. The SiGen PAB Process specifically excludes any other process or technology (including without limitation any layer-transfer-process), whether or not such other process or technology is required for the fabrication of SOI wafers or other laminated structures, and whether or not such other process or technology is (necessarily, typically or otherwise) practiced in conjunction or in combination with such plasma activated bonding process. By way of example and without limiting the generality of the foregoing, the "SiGen PAB Process" specifically excludes the following processes and related technologies: (a) implantation of particles, (b) oxidation, (c) deposition, (d) epitaxial growth, (e) etch, (f) separation (such as by cleaving), and (g) smoothing.

1.28    "SiGen PAB Patent Rights"

1.28.1  "SiGen PAB Patent Rights" means

(a) the patents and patent applications listed in Exhibit A, as such Exhibit may be amended from time to time upon agreement of the parties;

(b) subject to Section 2.6 and Section 1.28.2, any claims of other patents and patent applications owned or Controlled by SiGen to the extent necessary (i) to practice the SiGen PAB Process with Products as such SiGen PAB Process exists or existed, or as it is or was practiced, as of or at any time before the Effective Date, or (ii) to make Products for practicing the SiGen PAB Process as it exists or existed, or as it is or was practiced, as of or at any time before the Effective Date;

Confidential

(c) subject to Section 1.28.2 and to Section 1.28.2, any claims of other patents or patent applications owned or Controlled by SiGen that (i) constitute improvements to any claims included under clause (a) or (b) of this Section 1.28, (ii) are necessary or useful to practice the SiGen PAB Process or to make Products for practicing the SiGen PAB Process, and (iii) are based on inventions or discoveries Conceived or Reduced to Practice on or before the Effective Date; and

(d) any continuations, divisionals, continuations-in-part, or reissues or foreign equivalents based on any of the patents or patent applications described in clauses (a) through (c), subject to the limitations set forth in clauses (b) and (c) of this Section 1.28.1, in Section 1.28.2, and in Section 2.6.

1.28.2  Claims of any patent or patent application that SiGen does not own and that SiGen first commences to Control after the Effective Date will be included in the "SiGen PAB Patent Rights" only if (i) the grant of the license under such patent or patent application to EVG granted herein or the exercise of rights under such patents or patent applications by EVG hereunder would not result in an obligation of SiGen to pay royalties or other consideration to a third party that is not an Affiliate of SiGen, or (ii) (x) the grant of the license under such patent or patent application to EVG granted herein or the exercise of rights under such patents or patent applications by EVG hereunder would result in an obligation of SiGen to pay royalties or other consideration to a third party that is not an Affiliate of SiGen (a "Royalty Bearing License"), and (y) EVG exercises its option as described in Section 2.6 to include the patent or patent application licensed in such Royalty Bearing License within the SiGen PAB Patent Rights.

1.28.3  For purposes of clarification, the grant of a license under a patent or patent application to EVG granted herein or the exercise of rights under such patents or patent applications by EVG hereunder will be deemed to result in an obligation of SiGen to pay royalties or other consideration to a third party only if, and to the extent that, the royalties or other consideration that SiGen is actually obligated to provide to such third party increases as a result of the sublicense to EVG or its exercise of rights thereunder.  Thus, for example, a license under which SiGen pays a license fee to a third party will not be deemed to be a Royalty Bearing License for purposes of this Agreement if the amount of the fee payable by SiGen to such third party will not increase as a result of a sublicense to EVG or EVG's exercise of its rights thereunder.  SiGen will reasonably endeavor to notify EVG of any loss of Control of any patent or patent application Controlled by SiGen that is a SiGen PAB Patent Right, provided that an employee of SiGen in a responsible position is aware of such loss of Control and the fact that such patent or patent application is a SiGen PAB Patent Right.  The parties acknowledge and agree that any failure to provide such notice to EVG shall not constitute a breach of this Agreement.  The parties acknowledge that an assignee of any patent or patent application within the SiGen PAB Patent Rights that is owned by SiGen and subsequently assigned to such assignee acquires such patent or patent application subject to EVG's existing license rights under the License with respect to such patent or patent application.

1.29  "SiGen PAB Royalty Market" means the markets in which sales of Products will generate royalties payable by EVG to SiGen, which market is divided into the following three categories or tiers:

1.29.1  Products that are sold and used, or intended to be used, for any purpose, except those Products covered under Sections 1.29.2 and 1.29.3 or otherwise excluded under the remainder of this definition ("Tier I Royalty Market");

1.29.2  Products that are sold and used, or intended to be used, for the manufacture of any MEMS applications, except those Products covered under Section 1.29.3 or otherwise excluded under the remainder of this definition ("Tier II Royalty Market"); and

1.29.3  Products that are sold and used, or intended to be used, for the manufacture of MEMS applications for patterned wafers by an *in-situ* plasma activated bonding process, unless excluded under the remainder of this definition ("Tier III Royalty Market")

Notwithstanding anything to the contrary in this Agreement, the SiGen PAB Royalty Market expressly excludes sales of Products that are sold and used for, or intended to be used for (a) bonding Group III-V or Group II-VI element compound semiconductor layers, or (b) the manufacture of MEMS applications for patterned wafers by an *ex-situ*, single frequency RF sourcing plasma activated bonding process.

1.30   "Term" has the meaning set forth in Section 11.

1.31   "Territory" is world wide.

1.32   "Tier I Royalty Market," "Tier II Royalty Market," or "Tier III Royalty Market" has the meaning, as applicable, as set forth in Section 1.29.

## 2.   LICENSE GRANTS AND SERVICES TO BE PROVIDED.

### 2.1   License by SiGen to EVG.

2.1.1   License. Subject to the terms and conditions of this Agreement, SiGen grants to EVG, and EVG accepts, a non-exclusive, non-sublicensable and non-transferable (except as set forth in Sections 2.1.3 and 12.5 respectively) royalty-bearing (as set forth in Section 4.1), license (a) under the SiGen PAB Patent Rights: (i) to use, make and develop Products in the Territory, (ii) to sell, offer to sell, and export and import Products made by or for EVG in accordance with this Agreement in the Territory; (iii) to have made, except by Soitec (as defined in Section 3.6), solely on behalf of EVG, Products designed in all material respects by EVG and sold only to EVG, (iv) to provide maintenance services with respect to Products made and sold under this Agreement, and (b) under SiGen's Intellectual Property Rights in the Know-How Deliverables, to use the Know-How Deliverables solely for the purpose of making and developing Products in accordance with this Agreement and to provide maintenance services with respect to Products made and sold in accordance with this Agreement (collectively, the "License"). The parties acknowledge that no person or entity to whom any Product has been sold, directly or indirectly, by EVG in a transaction authorized under the License shall be required to obtain any license from, or pay any royalties or other amounts to, SiGen in order to use such Product to practice the SiGen PAB Process, although they may be required to pay a royalty to use such Product in conjunction or in combination with, or otherwise to practice, any other processes covered by any SiGen patents or Intellectual Property Rights. Without limiting anything in Section 2.1.1, nothing in this Agreement shall, or shall be construed to, confer to the

end-user purchaser of a Product that is made and sold in accordance herewith any right other than the right to use, in perpetuity, such Product to practice solely the SiGen PAB Process. Provided that EVG does not purport to grant such end user any additional rights, however, EVG makes no representation or warranty regarding or relating to the scope of rights that such end user may have with respect to such Product.

        2.1.2   <u>Restrictions</u>.  EVG acknowledges that the License is a license solely with respect to the Products, and is not a license, and does not otherwise grant any right, immunity from suit or other defense, directly or by implication, estoppel or otherwise with respect to any other products or any SiGen proprietary processes (other than with respect to the SiGen PAB Process as expressly set forth in Section 2.1.1), including any system or subsystem that may be combined with Products.  In the event of a sale or an anticipated sale of a Product to a Manufacturer (as defined below), EVG shall conspicuously include the following (or a substantially equivalent) statement on any quote or equivalent pre-sale correspondence relating to such Product and provided to such Manufacturer: "Use of this product in connection with activities relating to silicon-on-insulator wafers or layer-transfer products may be subject to intellectual property rights of third parties and may require a license from such third parties, which license is not conveyed as a result of the sale of this product."  For purposes of the foregoing "Manufacturer" shall mean any entity that (a), to EVG's actual knowledge (i.e., knowledge of an employee of EVG in a responsible position) at the time of such sale or anticipated sale, (i) makes SOI wafers or layer-transfer products, or (ii) intends to use such Product in connection with making SOI wafers or layer-transfer products, or (b), prior to such sale or anticipated sale, has been identified in writing by SiGen, in good faith, to EVG as a manufacturer of SOI wafers or layer-transfer products.  In addition EVG will reasonably endeavor to notify SiGen of any customer that uses a Product in the manufacture of SOI wafers or layer-transfer products, provided that an employee of EVG in a responsible position is aware of such use.  The parties acknowledge and agree that any failure to provide such notice to SiGen shall not constitute a breach of this Agreement.

        2.1.3   <u>Sublicenses</u>.  Subject to the terms and conditions of this Agreement, EVG may grant a sublicense only to authorize any third party (including any EVG Affiliate not deemed to be an "EVG" entity, as such term is defined herein) to sell Products manufactured by or on behalf of EVG under the license granted by SiGen to EVG pursuant to Section 2.1.1 (each a "<u>Distributor Sublicensee</u>").  Each Distributor Sublicensee must agree in writing to be bound by the applicable terms and conditions of this Agreement, except the grant of rights to the Distributor Sublicensee shall be limited as set forth in this Section 2.1.3.  EVG may not sell Products to any third party, except to end user customers and Distributor Sublicensees.

    2.2   <u>Restriction on Licenses to EVG Competitors</u>.  During the Term, SiGen shall not grant to any EVG Competitor, either directly or through any Successor(s)-in-Interest (as defined below), a license of the SiGen PAB Know-How, or the Restricted PAB Patent Rights (as defined below), to develop, make, sell or otherwise commercialize Products, and will not grant any EVG Competitor Successor, either directly or through any Successor(s)-in-Interest, a license of the SiGen PAB Know-How or the Restricted PAB Patent Rights to develop, make, sell or otherwise commercialize Products for use with the EVG Competitor's continued product lines within the Competing Business acquired by the EVG Competitor Successor from the EVG Competitor, unless (a) EVG provides SiGen prior written consent to grant such license, which consent may

be granted or withheld by EVG in the exercise of its sole and absolute discretion (except as provided below), and (b) SiGen pays to EVG twenty-five percent (25%) of all monetary consideration plus twenty five percent (25%) of the value of all other consideration received by SiGen from such EVG Competitor or EVG Competitor Successor in consideration of the grant of such license. The foregoing will not apply (i) to any license granted in connection with the settlement or other resolution of any intellectual property claim brought against SiGen, (ii) if EVG does not meet the targets to release Compatible Products set forth in Section 3.1, or (iii) if EVG fails to satisfy the Product Availability Requirements, but, in any case covered by clauses (ii) or (iii), only if:

2.2.1   SiGen notifies EVG, in writing, that EVG has failed to meet such target to release Compatible Products or to satisfy the Product Availability Requirements, which notice is provided not less than thirty (30) days before any license to an EVG Competitor or an EVG Competitor Successor in reliance on such failure is granted;

2.2.2   during the thirty (30) day period following such notice from SiGen, SiGen promptly provides EVG any reasonably available information reasonably requested by EVG regarding the nature and scope of such failure and the nature of scope of the required cure and negotiates with EVG in good faith to attempt to resolve any dispute regarding the occurrence or scope of any such failure or regarding whether such failure has been timely cured; and

2.2.3   SiGen does not grant such license if EVG cures such failure within such thirty (30) day period.

The parties acknowledge that the actual availability of Compatible Products, in accordance with the targets set forth in Section 3.1 and the Product Availability Requirements is a material condition of the covenant set forth in this Section 2.2 and that, regardless of any dispute as to the matters set forth in Section 2.2.2, the covenant set forth in this Section 2.2 will not apply if such Compatible Products are not available in accordance with such targets and Product Availability Requirements after the thirty (30) day period specified therein. In addition, SiGen will notify EVG of any license that it intends to grant or has granted in reliance on a condition specified in clause (i) above of the previous sentence (i.e., in settlement of the intellectual property claims described therein), provided such notification would not result in a breach of any confidentiality or other obligations. Such notice will be provided by SiGen at least thirty (30) days before it grants such license, provided that such advance notice is not, in SiGen's reasonable judgment, detrimental to its efforts to settle the related dispute. For purposes of this Section 2.2, "Product Availability Requirements" means the availability for purchase from EVG by end-user customers on a non-discriminatory basis (i) of Compatible Products for all wafer sizes of 300mm and below (i.e., 300mm, 200mm, 150mm and 100mm), (ii) at commercially reasonable terms, including reasonably fair market pricing, (iii) for delivery within lead-times not to exceed nine (9) months from the time of order (provided that additional lead time may be required for quantities that materially exceed reasonably anticipated market demand), and (iv) in quantities sufficient to meet reasonably anticipated market demand. For the avoidance of doubt, this Section 2.2 does not apply to, and nothing herein shall affect, any rights or licenses granted by SiGen to any entity that, at the time of such grant, is not an EVG Competitor or an EVG Competitor Successor, regardless of whether such entity subsequently becomes an EVG Competitor or an EVG Competitor Successor, unless such license is granted to an entity in

anticipation that it will become an EVG Competitor or an EVG Competitor Successor with the intent of circumventing the restrictions in this Section 2.2

"Restricted PAB Patent Rights" shall mean all of the SiGen PAB Patent Rights other than those that SiGen commences to Control after the Effective Date and does not own. "Successor-in-Interest" means any third party that acquires any rights under any of the Restricted PAB Patent Rights from SiGen, to the extent such rights would allow such third party to license an EVG Competitor or an EVG Competitor Successor to develop, make, sell or otherwise commercialize Products (the "Acquired Rights"), whether by license, assignment or otherwise, and whether directly or through any intermediate licensees, sublicensees or assignees. "Successor-in-Interest" specifically does not include the Excluded Licensee (as defined below).

SiGen shall ensure that all Successors-in-Interest are subject to this Section 2.2 with respect to their Acquired Rights. The parties acknowledge that four (4) certain parties have certain rights under certain license agreements entered into in connection with SiGen's Series A financing between September 1997 and December 1997, and the parties agree that nothing herein shall affect or limit, and that this Section 2.2 shall not apply, to any rights of such parties under such license agreements (and specifically including rights under such agreements that may mature after the Effective Date or are subject to certain conditions precedent that may occur after the Effective Date). Notwithstanding anything herein, in no event shall the restriction in Section 2.2 apply to that certain other party that acquired a license under certain SiGen PAB Patent Rights in May 2003 (such party being the "Excluded Licensee").

If SiGen desires to grant a license to any EVG Competitor or EVG Competitor Successor for the purpose of settling any intellectual property claim brought by SiGen against such EVG Competitor or EVG Competitor Successor, then EVG shall not unreasonably withhold its consent to such license.

The EVG Competitor's continued product lines within the Competing Business acquired by the EVG Competitor Successor from the EVG Competitor shall include any product developed, manufactured or marketed by or for the EVG Competitor before such acquisition ("Existing Competitor Product"), and any technology of such Existing Competitor Product that is incorporated in any new, successor or enhanced version thereof developed, manufactured or marketed by or for the EVG Competitor Successor after such acquisition.

2.3     SiGen PAB Know-How Deliverables. SiGen agrees to provide EVG, within forty-five (45) days of the Effective Date, the SiGen PAB Know-How Deliverables. Any documentation provided under this Section by SiGen to EVG relating to assembly and manufacture of components of Products will be in the form of such documentation used by SiGen as of the Effective Date. SiGen will use reasonable efforts to respond promptly to reasonable follow-up requests for information by EVG relating to EVG's development of the initial Compatible Product under this Agreement.

2.4     Corporate Events. In the event of a merger, consolidation, sale, reorganization or similar event involving SiGen or any assignment pursuant to Section 12.5 where the result of any of the foregoing is that SiGen ceases to exist or substantially all of its assets relating to the subject matter of this Agreement are transferred to another entity, that was not an Affiliate of

SiGen immediately before such transaction (an "Event"), "SiGen PAB Patent Rights" shall be limited to patents (i) that were SiGen PAB Patent Rights immediately before the consummation of such Event, (ii) that meet the definition of SiGen PAB Patent Rights after the consummation of such Event and claim inventions that were Conceived or Reduced to Practice by SiGen prior to consummation of such Event, and (iii) described in Section 1.28(d) that result from such patents described in clauses (i) and (ii) of this Section 2.4. In the case of an Event involving SiGen and the Excluded Licensee (as defined in Section 2.2), in no event shall the restriction in Section 2.2 apply to any entity that is a surviving entity after, is formed in connection with, or otherwise results or benefits from, such Event.

    2.5    <u>Reservation of Rights</u>.  SiGen reserves and retains all right, title and interest to ownership of, and Control over, its Intellectual Property Rights, patents, patent applications and other patent and proprietary rights not expressly granted to EVG pursuant to this Agreement, including title to and ownership of the SiGen PAB Patent Rights and SiGen PAB Know-How. No right or license not expressly granted hereunder shall be implied by or inferred from this Agreement or the activities of the parties under or in connection with this Agreement. Notwithstanding any other provision of this Agreement (except as provided below in this Section 2.5), nothing in this Agreement shall in any way limit or restrict EVG's right and power to do, or authorize, encourage or engage any third party to do, anything with respect to its products (including Products), so long as doing so would not and does not infringe any patent rights of SiGen (including SiGen PAB Patent Rights) or any Intellectual Property Rights or other proprietary rights of SiGen; provided that the foregoing shall not limit or otherwise affect (i) EVG's obligations under Section 3.6, and EVG's obligation to pay royalties, with respect to all Products, and (ii) EVG's obligations under Section 7.

    2.6    <u>New Patents</u>

    2.6.1    SiGen will reasonably endeavor (i) to notify EVG of any patent or patent application that is among the patents and patent applications described in clauses (b), (c) or (d) of Section 1.28.1 and that SiGen commences to own or otherwise Control after the Effective Date, provided that an employee of SiGen in a responsible position is aware of such commencement of ownership or Control and the fact that such patent is among the patents and patent applications described in clauses (b), (c) or (d) of Section 1.28.1 (a "Notice of New Patent"), and (ii), to the extent not inconsistent with any confidentiality or other obligations to third parties, the scope of the rights of SiGen to license, sublicense or otherwise grant to EVG rights of and within the scope of the rights granted herein.  The parties acknowledge and agree that any failure to provide such notice to EVG shall not constitute a breach of this Agreement.

    2.6.2    If any patent described in a Notice of New Patent is not owned by SiGen and is licensed to SiGen after the Effective Date under a Royalty Bearing License, then the applicable Notice of New Patent will include, to the extent not inconsistent with any confidentiality or other obligations to third parties, the applicable details regarding any obligation of SiGen or its sublicensees to pay royalties or other consideration to a third party that is not an Affiliate of SiGen resulting from the grant of the license under such patent to EVG granted herein or the exercise of rights under such patents by EVG hereunder.  EVG will have the option, exercisable upon written notice provided to SiGen within thirty (30) days after receiving any Notice of New Patent regarding any patents or patent applications subject to a

Royalty Bearing License, to include such patents or patent applications in the SiGen PAB Patent Rights, provided that such notice from EVG includes EVG's agreement to reimburse SiGen for any royalties or other consideration specified in the applicable Notice of Patent License that result from the license under such patent to EVG granted herein or the exercise of rights under such patents by EVG hereunder. EVG will not have rights hereunder with respect to any patent licensed to SiGen under a Royalty Bearing License unless and until EVG exercises its option described in this paragraph with respect thereto. No licensor under any Royalty Bearing License shall be a third party beneficiary of EVG's obligation hereunder or its other obligations under this Agreement, regardless of whether EVG elects to include patents under such license in the SiGen PAB Patent Rights.

3.      MARKETING OPPORTUNITIES.

3.1      By EVG. EVG will use commercially reasonable efforts to market and sell Products, but SiGen acknowledges that EVG has made no representation or guarantee regarding the success of EVG's efforts or the amount of royalty that will be payable under this Agreement. Without limiting the generality of the preceding sentence, EVG agrees to exercise commercially reasonable best efforts to commence general commercial sales, including pre-release marketing, and release of Compatible Products for all wafer sizes of 300mm and below (i.e., 300mm, 200mm, 150mm and 100mm) within nine (9) months from the Effective Date. EVG, however, expressly is not committed to any minimum sales requirements or royalty amount. EVG will establish a location at its headquarters or principal manufacturing facility within Austria in order to provide demonstrations of the Products (including Compatible Products) to current and potential EVG customers. However, the determination whether to market or continue to market and sell Products, for any reason whatsoever, shall be made by EVG in its sole discretion.

3.2      By SiGen. SiGen agrees to introduce EVG as a licensed manufacturer and distributor of Products to potential customers and licensees of SiGen PAB Patent Rights, provided that EVG is then generally meeting the Product Availability Requirements. SiGen further will have the right but not the obligation to make itself available for visits and sales calls with actual and potential EVG customers of Products, as requested by EVG. SiGen agrees to cooperate in good faith in responding to any EVG customer inquiries in which EVG needs to provide information regarding the SiGen PAB Patent Rights or Products.

3.3      Joint Opportunities. Although neither party guarantees any success in terms of marketing or sales, EVG and SiGen agree to work cooperatively and in good faith in the development and support of individual or joint sales opportunities relating to Products.

3.4      Limitations. Notwithstanding Sections 3.2 and 3.3, each party acknowledges that the other party currently may have, or in the future may enter into third party relationships, that may limit or preclude joint marketing efforts in respect of particular Products.

3.5      OEM Relationship. The parties agree to negotiate in good faith a restated OEM and Reseller Agreement, under which SiGen has the right to purchase from EVG under commercially reasonable terms and resell Compatible Products (it being understood that no royalties would be due from EVG to SiGen hereunder on account of sales by EVG to SiGen). The parties agree that SiGen shall not conduct any resale activities under the OEM and Reseller

Confidential                                                                                          Page 12 of 26

Agreement between the parties dated March 24, 2001 (the "Existing OEM Agreement") for a period of sixty (60) days from the Effective Date. If such restated OEM and Reseller Agreement is not executed within such (60) day period, either party will have the right to terminate the Existing OEM Agreement upon written notice to the other party.

3.6     Restrictions Regarding ██. Notwithstanding anything to the contrary in this Agreement (but except as provided below in this Section 3.6), SiGen may immediately terminate this Agreement in the event (a) that EVG enters into a commercial relationship with ██ or any of its Affiliates or any successors to its or their business ( ██ ) under which (i) ██ is or would be a reseller, distributor, or OEM reseller of Products or other plasma-activated bonding tools, or (ii) ██ and EVG cooperate or would cooperate in research, development, support or similar activities relating to Products or other plasma-activated bonding tools (but not including activities that are incidental to a normal supplier/end user customer relationship, including, without limitation, any activities relating to the customization or enhancement of any Product or other plasma-activated bonding tools provided to ██ for its use; and (b) of any merger, acquisition, sale of assets or similar transaction involving ██ and EVG, provided that in the event described in clause (b), SiGen shall refund to EVG any portion of the initial license fee then received under Section 4.1.1 hereof, if SiGen chooses to terminate this Agreement based on such event. Notwithstanding anything to the contrary in Section 7, in no event shall EVG disclose any Confidential Information of SiGen to ██, except where Products or related services are provided to ██ as an end-user customer and such Confidential Information is incorporated in the materials provided to end-user customers of such Products or related services generally.

**4.     PAYMENTS.**

4.1     By EVG to SiGen.

4.1.1     Initial License Fees. In consideration of the license granted by SiGen pursuant to Section 2.1, EVG shall pay SiGen an aggregate, non-creditable, non-refundable initial license fee ███████████████ according to the following schedule:

(a)     ███████████████ shall be paid upon the Effective Date of this Agreement; and

(b)     ███████████████ shall be paid within thirty (30) days following the earlier of (i) EVG's first commercial sale of a Product, which means the receipt by EVG of an executed purchase order or other agreement evidencing a customer's binding intent to acquire such product, or (ii) the date that is twelve (12) months after the Effective Date.

4.1.2     Royalty Payment; Sales Inside SiGen PAB Royalty Market. EVG agrees to pay SiGen a royalty on each Product sold by EVG or sold by a Distributor Sublicensee in the SiGen PAB Royalty Market in the Territory. Such royalty equals a percentage of Net Sales, calculated as follows:



(a)    For the Tier I Royalty Market: (a) ███████████ of Net Sales of the initial fifty (50) Products sold; (b) ███████████ of Net Sales of the fifty-first (51st) through one-hundredth (100th) Product sold; and (c) ███████████ of Net Sales of all Products sold thereafter:

(b)    For the Tier II Royalty Market: (a) ███████████ of Net Sales of the initial fifty (50) Products sold; and (b) ███████████ of Net Sales of all Products sold thereafter; and

(c)    For the Tier III Royalty Market, one and ███████████ of Net Sales of all Products sold.

Notwithstanding the description of the SiGen PAB Royalty Market, EVG expressly agrees that any sales of Products to XHP Microsystems Inc. ("XHP") will be deemed to be sales of Products within the Tier I Royalty Market, regardless of the application for which the Product is sold and used. For example, a sale of a Product to XHP for use in an application under the Tier III Royalty Market nonetheless will be deemed to be a sale triggering royalties under the Tier I Royalty Market calculation. In addition, sales of Products to XHP shall be included in determining the percentage royalty applicable to sales of Products generally, within the Tier I Royalty Market.

4.1.3    Sales. For purposes of this Agreement, sales of Products by Sublicensee Distributors shall be deemed sales of Products by EVG and all references to sales by EVG shall include sales by Sublicensee Distributors. No royalties shall be due on the sale of a Product by EVG to a Sublicensee Distributor as long as a royalty is paid on the sale of such Product by such Sublicensee Distributor. For the avoidance of doubt, the sale of a Product by any one EVG entity to any other EVG entity shall be subject to royalties if such Product is used for production purposes rather than for demonstration and marketing purposes and such Product is not subsequently resold by such other EVG entity and a royalty paid on the resale of such Product by such other EVG entity. If EVG commences to use a Product for production purposes, EVG shall be required to pay a royalty for such Product based on the fair market price of such Product. The parties understand that (i) it may take EVG about nine (9) months to fulfill orders for Products, (ii) EVG may supply wafers that EVG manufactures using Products to EVG's potential customers while such potential customers wait for their orders to be delivered, and accordingly the parties agree that, notwithstanding the previous sentence, the use of Products by EVG to supply such potential customers will not give rise to any royalty obligation based on EVG's use of such Product for such purpose.

4.1.4    Royalty Term. EVG's obligation to pay royalties to SiGen from Net Sales of Products in the SiGen PAB Royalty Market shall continue for each Product sold in the Territory, until the expiration of the last to expire issued patent within the SiGen PAB Patent Rights.

4.1.5    Sales Outside SiGen PAB Royalty Market. SiGen expressly acknowledges and agrees that EVG's obligation to pay royalties to SiGen in respect of sales of Products applies solely to sales by EVG within the SiGen PAB Royalty Market. The preceding sentence, however, is not intended to limit EVG's rights under the License, which include the

right to manufacture and sell Products under the License in the Territory in all markets within or without the SiGen PAB Royalty Market.

4.1.6   <u>SiGen Obligations to Third Parties</u>. SiGen acknowledges and agrees that the payments by EVG under this Agreement cover, and, except as set forth herein, SiGen solely is responsible for any and all obligations or payments to third party inventors, assignors, or licensors to SiGen of all or any part of the SiGen PAB Patent Rights (provided that nothing in this Section 4.1.6 limits EVG's obligation under Section 2.6 to reimburse SiGen for royalties paid by SiGen under Royalty Bearing Licenses granted to SiGen after the Effective Date which EVG expressly elects to include in the SiGen Patent Rights pursuant to Section 2.6) or SiGen's Intellectual Property Rights licensed hereunder, which obligations or payments to such third parties arise under or result from EVG's exercise of the License, including the sale of Products. Notwithstanding the foregoing, if EVG sells a Product in the Territory, and such sale (a) falls outside of the Tier I Royalty Market, the Tier II Royalty Market, and the Tier III Royalty Market, *and* (b) generates an obligation for SiGen to pay royalties to Shari Farrens, then SiGen shall notify EVG of such royalty obligation and shall provide EVG all reasonable information in respect of the royalty and how it is determined, and EVG and SiGen further agree to negotiate in good faith an applicable minimum royalty to be payable by EVG, directly or on SiGen's behalf, to Shari Farrens. If the parties do not so agree, EVG shall be liable, and reimburse SiGen for, such royalties payable to Shari Farrens, which royalties will not exceed $5,000 per Product.

4.2   <u>By SiGen to EVG</u>. SiGen agrees to pay EVG all amounts owed under Section 2.2, which obligation continues until the effective date of termination of the restriction under Section 2.2, as set forth therein and without limiting any obligation to pay royalties that accrue prior to such effective date. Such revenue is intended to be fully inclusive, including royalties on product sales and other monetary consideration received by SiGen from an EVG Competitor or EVG Competitor Successor licensee. In addition, SiGen shall make such payment in respect thereof and report to EVG, and EVG shall have the same rights of inspection, in respect of such payment obligations, as is set forth in Section 5.

## 5.   PAYMENTS; BOOKS AND RECORDS.

5.1   <u>Royalty Reports and Payments</u>. After the first sale of any Product by EVG, EVG shall deliver written reports to SiGen for each calendar quarter within forty five (45) days after the end of such quarter, stating in each such report the number and description of each Product sold, including whether the Product was sold within the SiGen PAB Royalty Market, and including whether the Product was sold in the Tier I Royalty Market, the Tier II Royalty Market, or the Tier III Royalty Market and the Net Sales with respect thereto and the calculation of royalties due thereon. Concurrent with the delivery of the report required pursuant to this Section 5.1, EVG shall pay to SiGen all royalties that have accrued hereunder as of the close of the prior calendar quarter.

5.2   <u>Payment Method</u>. All payments due under this Agreement shall be made by check or by bank wire transfer to a bank account designated by SiGen. All payments hereunder shall be made in US Dollars. If the due date of any payment is a Saturday, Sunday or national holiday, such payment may be paid on the following business day.

5.3     Late Payments.  All sums owed or payable hereunder that are not paid when due shall bear interest at the lesser of (a) LIBOR plus five percent (5%) per annum, or (b) the maximum rate permitted under applicable law, from the original due date to the date paid in full. The payee's right to receive interest shall not constitute a forbearance or waiver by the payee, nor affect the payee's other rights and remedies (whether under this Agreement or otherwise) with respect to any lateness in payment or failure to pay.

5.4     Currency Conversions.  If any currency conversion shall be required in connection with the calculation of royalties hereunder, such conversion shall be made using the selling exchange rate for conversion of the foreign currency into US Dollars, quoted for current transactions reported in Reuters for the second to last business day of the month prior to the month in which payment is due.

5.5     Records; Inspection.  EVG shall keep complete, true and accurate books of account and records, and shall require its Distributor Sublicensees to do the same, for the purpose of determining the royalty amounts payable under this Agreement.  Such books and records shall be kept at EVG's or Distributor Sublicensees' principal place of business, for at least two (2) years following the end of the quarterly period to which they pertain.  Such books and records shall be open for inspection by SiGen during such two (2) year period by a public accounting firm engaged on a non-contingency fee basis for whom EVG or the Distributor Sublicensee, as applicable, has no reasonable objection, solely for the purpose of verifying royalty statements hereunder.  Upon EVG or the Distributor Sublicensee's request, as applicable, the accounting firm, and each of its employees and agents conducting the inspection and review pursuant to this Section, shall enter into a confidentiality and nondisclosure agreement in a form reasonably acceptable to EVG or the Distributor Sublicensee, as applicable, which agreement, among other things, shall prohibit disclosure to SiGen of any Confidential Information reviewed by the accounting firm, including any summaries or reports prepared by the accounting firm or its employees or agents, and based upon such Confidential Information, provided that such auditor may report to SiGen whether there has been, and the amount of, an underpayment or overpayment of amounts due hereunder, and the basis for such determination.  Such inspections may be made no more than once each calendar year and not more than once in respect such books and records inspected, at reasonable times and on reasonable notice.  Inspections conducted under this Section 5.5 shall be at SiGen's expense, unless the audit reveals an underpayment by EVG of five percent (5%) or more, in which case EVG shall be responsible for all expenses associated with such inspections.

6.     **INTELLECTUAL PROPERTY.**

6.1     Inventorship and Title.

6.1.1   Inventorship in respect of improvements and modifications to the SiGen PAB Process, the SiGen PAB Know-How, or any subject matter covered by the SiGen PAB Patent Rights shall be determined in accordance with applicable law; *provided, however,* the parties agree that ownership of inventions, patents, patent applications, and Intellectual Property Rights in respect of such improvements and modifications shall be as follows:

        (a)     all patents, patent applications and Intellectual Property Rights in respect of such improvements and modifications developed solely by SiGen shall be owned solely by SiGen;

        (b)     all patents, patent applications and Intellectual Property Rights in respect of such improvements and modifications developed solely by EVG, whether such discovery was enabled by the use in accordance with this Agreement of SiGen PAB Know-How Deliverables disclosed to EVG pursuant to Section 2.3 and provided that such development was in accordance with the terms and conditions of this Agreement, shall be owned solely by EVG; and

        (c)     all patents, patent applications and Intellectual Property Rights in respect of such improvements and modifications developed jointly by EVG and SiGen, as determined by applicable law, shall be jointly owned by SiGen and EVG in equal undivided shares (such jointly owned technology is referred to as "Jointly Owned PAB Technology") Subject to any other patents and Intellectual Property Rights of the other party and to SiGen's restrictions pursuant to Section 2.2 (to the extent and as long as such restriction exists under the terms of this Agreement), each party shall be free and have the unrestricted right to use, exploit and commercialize such Jointly Owned PAB Technology and to license and sub-license such Jointly Owned PAB Technology without the consent of the other party and without any duty to account for or share proceeds with the other party on account of such use, exploitation, commercialization, licensing or sublicensing. For the avoidance of doubt, nothing in this Section 6.1.1 shall (i) affect any other provisions or obligations of a party under this Agreement, including, without limitation, EVG's royalty obligations and any restrictions on use and disclosure of Confidential Information hereunder, or (ii) grant or otherwise convey, whether expressly, by implication or otherwise, to a party any right with respect to any patents or Intellectual Property Rights of the other party that are not Jointly Owned PAB Technology. Any disclosure of subject matter embodying Jointly Owned PAB Technology by either party to any third party shall, with respect to the protection of secrecy and restrictions on use and disclosure of such subject matter, be subject to the same terms and conditions under which such party discloses its own technology of similar nature and importance.

        6.1.2     SiGen and EVG each agrees to assign, transfer, convey, and deliver to the other party, and hereby does irrevocably assign, transfer, convey, and deliver to the other party, the assigning party's an equal undivided share of the right, title, and interest in the Jointly Owned PAB Technology to give effect to the parties' intent regarding ownership and title as is set forth under Section 6.1.1(c). Additionally, at any time and from time to time upon request by EVG or SiGen, as the case may be, to the other party, the party receiving such request, shall execute, and shall cause its employees and agents, past or present, to execute, such documents as are necessary to perfect, compel or evidence the assignments as set forth in this Section 6.1.2 or otherwise effectuate the agreement of the parties as specified in this Section 6.1. Any assignment or transfer of any such rights in contravention of the provisions of this Section shall be *void ab initio* and without any force or effect.

    6.2     Defense of Patent Rights.  SiGen may Control and be solely responsible, at its absolute discretion, for all matters including the costs related to the prosecution, maintenance, enforcement and defense of the SiGen PAB Patent Rights, including rights in respect of patent

prosecution, maintenance, enforcement and defense.  Each party may Control and be solely responsible, at its absolute discretion, for all matters including the costs related to the prosecution, maintenance, enforcement and defense of its patents and Intellectual Property Rights, including rights in respect of patent prosecution, maintenance, enforcement and defense; provided, however, the parties shall negotiate in good faith a cost-sharing and patent and Intellectual Property Rights maintenance agreement in respect of Jointly Owned PAB Technology.  Neither of the parties shall be required hereunder to file any patent application, secure any patent or patent rights, maintain any patent in force, institute any action or suit against third parties for infringement of any of the SiGen PAB Patent Rights or defend any action or suit brought by a third party which challenges or concerns the validity of any of the SiGen PAB Patent Rights.

6.3     Use of SiGen Name and SiGen Trademark.  Subject to the terms and conditions of this Agreement and any reasonable rules or usage guidelines of which SiGen notifies EVG in writing, SiGen grants to EVG a non-exclusive, non-transferable, non-sublicensable (except to Distributor Sublicensees, subject to all applicable terms and conditions of this Agreement, and as provided in Section 12.5) royalty-free right (a) to reference SiGen as the licensor of the Products in connection with the sale of Products, and (b) to use and display SiGen's NanoBond™ trademark solely in connection with the sale of applicable Products.  Such rights to use and display the NanoBond trademark may be suspended by SiGen upon written notice to EVG if and as long as the Products do not meet at least the quality standards currently met by Products marketed under SiGen's NanoBond trademark, provided that SiGen shall reasonably cooperate with EVG, at EVG's expense, in EVG's reasonable efforts to meet such quality standards by providing to EVG any information it reasonably requires to meet such standards, and provided further that EVG will not be obligated hereunder to recall any packaging or advertising or promotional materials previously delivered or distributed and may utilize any existing stock of such materials for not more than sixty (60) days.

7.     **CONFIDENTIALITY.**

7.1     Confidential Information.  Except as expressly provided in this Agreement, the parties agree that the receiving party shall keep completely confidential and shall not publish or otherwise disclose to any third party and shall not use for any purpose except for the purposes of exercising its rights and performing its obligations under this Agreement any Confidential Information furnished to it by the disclosing party hereto pursuant to this Agreement.  Without limitation upon any provision of this Agreement, each of the parties hereto shall be responsible for the observance by its employees of the confidentiality obligations set forth in this Section 7 and this Agreement, generally.

7.2     Permitted Disclosures.  Except as otherwise limited by this Agreement, each party hereto may disclose the other party's Confidential Information (a) to its financial, business and legal advisors, financial investors and other similarly situated third parties on a need to know basis, if such permitted recipients agree to be bound by the terms of this Section 7, and (b) to the extent such disclosure is reasonably necessary in connection with complying with applicable governmental regulations or otherwise submitting information to tax or other governmental authorities, or (c) to a Distributor Sublicensee when making a permitted sublicense, provided the recipient is bound by restrictions on use and disclosure at least as protective as those set forth

herein: provided that if a party is required by law or judicial order, or pursuant to an action or suit, to make any such disclosure of another party's Confidential Information, other than pursuant to a confidentiality agreement, it shall give reasonable advance notice to the latter party of such disclosure and shall cooperate with the original disclosing party in any effort by the original disclosing party to secure a protective order blocking the disclosure of, or otherwise affording confidential treatment to, such Confidential Information.

      7.3    Terms and Conditions of Agreement  Each party agrees that the terms and conditions of this Agreement shall not be disclosed to third parties: provided that each party may disclose the terms and conditions of this Agreement: (a) as required by judicial order or other legal obligation, provided that, in such event, the party subject to such obligation shall promptly notify the other party to allow intervention (and shall cooperate with the other party) to contest or minimize the scope of the disclosure (including application for a protective order): (b) as required by the applicable securities laws, including, without limitation, requirements to file a copy of this Agreement or to disclose information regarding the provisions hereof or performance hereunder, provided that such filing or disclosing party shall seek confidential treatment of any terms and conditions hereof and any information contained herein to the maximum extent permissible; (c) in confidence, to legal counsel, accountants and other professionals who are under similar obligations to maintain the confidentiality thereof; (d) in confidence (on an outside counsel-only basis), to outside counsel for a third party which plans to acquire all or substantially all the equity or assets of, or to merge with, such party, in connection with a "due diligence" investigation for such a transaction: (e) in confidence, to investors and potential investors: and (f) in confidence, to a Controlling entity (including its officers and directors).

## 8.    REPRESENTATIONS AND WARRANTIES.

      8.1    By SiGen.  SiGen represents, warrants and covenants to EVG that: (a) it has the full right and authority to enter into this Agreement and perform all its obligations hereunder; (b) the execution of this Agreement will not violate, conflict with, require consent of, or cause a default under any third party agreement to which SiGen is a party; (c) as of the Effective Date and to the knowledge of SiGen as of the Effective Date, the SiGen PAB Process, as practiced by SiGen as of or at any time before the Effective Date, does not violate or infringe against the patents or Intellectual Property Rights of a third party; (d) as of the Effective Date, there are no existing or threatened actions, suits or claims pending against SiGen with respect to its right to enter into and perform its obligations under this Agreement, or that, if true, would prevent EVG from exercising the License or any other of its rights hereunder; and (e) SiGen has not previously granted any rights to a third party in conflict with the rights or License granted to EVG under this Agreement.

      8.2    By EVG.  EVG represents and warrants to SiGen that: (a) it has the full right and authority to enter into this Agreement and perform its obligations hereunder; (b) the execution of this Agreement will not violate, conflict with, require consent of, or cause a default under any third party agreement to which EVG is a party; and (c) as of the Effective Date and to the knowledge of EVG, there are no existing or threatened actions, suits or claims pending against it with respect to its right to enter into and perform its obligations under this Agreement.

## 9.    INDEMNIFICATION.

9.1     Indemnification of EVG.  SiGen shall (i) defend EVG and its directors, shareholders, officers, employees, agents, consultants and counsel, and the successors and assigns of the foregoing (the "EVG Indemnitees") against any claim, suit or proceeding brought by a third party against an EVG Indemnitee, arising from or occurring as a result of any breach by SiGen: (a) of its representations, warranties, and covenants set forth in Section 8.1; (b) its obligations of confidentiality under Section 7; or (c) of its obligations to third parties described in Section 4.1.6, and (ii) pay all liabilities, damages, losses, costs or expenses (including reasonable attorneys' and professional fees and other expenses of litigation and arbitration) finally awarded against the EVG Indemnitee in, and to the extent attributable to, such claim, suit or proceeding.

9.2     Indemnification of SiGen.  EVG shall (i) defend SiGen and its respective directors, shareholders, officers, employees, agents, consultants and counsel and the successors and assigns of the foregoing (the "SiGen Indemnitees") against any claim, suit or proceeding brought by a third party against a SiGen Indemnitee, arising from or occurring as a result of: (a) any practice by EVG of the License granted herein or other use by EVG of any SiGen PAB Patent Rights or SiGen PAB Know-How Deliverables; (b) the manufacture, use, importation, marketing, and sale of any Product by EVG, except, in each case, (i) to the extent caused by the gross negligence or willful misconduct of SiGen, or (ii) if arising from or resulting from a wrongful act, error, or omission by SiGen giving rise to SiGen's indemnification obligations pursuant to Section 9.1; (c) a breach by EVG of its representations and warranties set forth in Section 8.2; (d) a breach of its obligations of confidentiality under Section 7; or (e) a breach of its obligations to third parties described in Section 4.1.6, and (ii) pay all liabilities, damages, losses, costs or expenses (including reasonable attorneys' and professional fees and other expenses of litigation and arbitration) finally awarded against the SiGen Indemnitee in, and to the extent attributable to, such claim, suit or proceeding.

9.3     Procedure.  A party (the "Indemnitee") that intends to claim indemnification under this Section 9 shall promptly notify the other party (the "Indemnitor") of any claim, suit or proceeding in respect of which the Indemnitee intends to claim such indemnification, and the Indemnitor shall have the right to participate in, and, to the extent the Indemnitor so desires, to assume sole Control of the defense thereof with counsel mutually satisfactory to the parties, including, the right to settle the action on behalf of the Indemnitee on any terms the Indemnitor deems desirable in the exercise of its sole discretion, except that the Indemnitor shall not, without the Indemnitee's prior written consent, settle any such claim if such settlement contains a stipulation to or admission or acknowledgment of any liability or wrongdoing on the part of the Indemnitee or imposes any obligation on the Indemnitee other than a monetary obligation, and only to the extent the Indemnitor assumes directly such obligation.  The failure to deliver written notice to the Indemnitor within a reasonable time after the commencement of any such action shall not impair Indemnitor's duty to defend such action but shall relieve Indemnitor of any liability to the Indemnitee solely to the extent the Indemnitor is prejudiced by the delay.  At the Indemnitor's request and expense, the Indemnitee shall cooperate fully with the Indemnitor and its legal representatives in the investigation and defense of any action, claim or liability covered by this indemnification and provide full information with respect thereto.

## 10.   DISCLAIMER OF WARRANTIES

*Except as expressly set forth in Section 8, neither party makes any representations or warranties relating to the rights and technology licensed under, or otherwise with respect or relating to this Agreement. To the maximum extent permitted by applicable law, each party hereby disclaims all other representations and warranties, whether express, implied or statutory, including (without limitation) any warranty of accuracy, non-infringement, merchantability, and fitness for a particular purpose, and any and all warranties that may arise from course of dealing, course of performance or usage of trade.*

## 11.   TERM AND TERMINATION.

11.1   Term.  The term of this Agreement shall commence on the Effective Date and shall continue until terminated as provided herein (the "Term").

11.2   Termination by EVG.  EVG may, upon prior notice to SiGen of at least ninety (90) days, terminate this Agreement.

11.3   Termination for Cause.  Either party shall have the right to terminate this Agreement as provided elsewhere in this Agreement or immediately on notice upon a breach of any obligation under this Agreement by the other party, which breach is not remedied within thirty (30) days following the date the non-breaching party gives the other party notice setting forth in reasonable detail the elements of such breach. Notwithstanding the foregoing, if SiGen provides notice of breach to EVG hereunder and EVG provides written notice back to SiGen within the foregoing thirty (30) day cure period contending in good faith that EVG is not in breach of this Agreement, then SiGen may not terminate this Agreement unless and until a court of competent jurisdiction rules in a decision on the merits that EVG is in breach of this Agreement (and EVG has not cured such breach prior to such decision), in which case SiGen may terminate this Agreement immediately upon written notice and EVG shall have no further opportunity to cure such breach.  To the extent that the alleged breach relates to payments due hereunder, EVG may be required to deposit amounts subject to good faith dispute with the court or into an escrow or similar account established by the court until the dispute with respect to such amounts is resolved.

11.4   Accrued Obligations.  Termination of this Agreement for any reason shall not release any party from any liability which, at the time of such termination, has already accrued to the other party or which is attributable to a period prior to such termination or the performance of which was due prior to such termination, nor preclude either party from pursuing any rights and remedies it may have hereunder and at law and in equity which accrued or are based upon any event occurring prior to such termination.

11.5   Post-Termination Sales of Products.

11.5.1  As used herein, a "Post-Termination SiGen Product" means solely a product the making, using or selling of which would infringe a valid, issued and existing claim of a patent under the SiGen PAB Patent Rights or that utilizes, or the manufacture or use of which utilizes, the SiGen PAB Know-How Deliverables  Except as expressly permitted in Section 11.5.2 or as otherwise agreed in writing by the parties, EVG shall not, and shall have no rights

to, make, develop, use, sell, or otherwise commercialize any Post-Termination SiGen Products after termination of this Agreement.

     11.5.2   Provided EVG continues to pay SiGen royalties that accrue from sales in the SiGen PAB Royalty Market and is not otherwise in breach of this Agreement, EVG may, in accordance with the terms of this Agreement, continue to market, distribute and sell for one year after such termination Products existing or in production as of the effective date of any termination of this Agreement and may continue in perpetuity to support its customers that have purchased Products during the Term or within the one year period following termination of this Agreement and in accordance with the terms of this Agreement and to use, in accordance with the terms of this Agreement, the SiGen PAB Know-How Deliverables provided hereunder, in perpetuity solely to the extent necessary to support such customers.  End user licenses and third party maintenance licenses, if applicable, granted prior to termination (and during the one year period following termination) of this Agreement also shall continue in accordance with their terms, including in accordance with any renewal terms thereof.

     11.6    Effect of Termination.

     11.6.1   Except as otherwise set forth in this Section 11 including under Section 11.5, upon any termination of this Agreement or termination of the License granted hereunder, EVG shall promptly cease any use of, including for evaluation or sale, the applicable SiGen PAB Patent Rights and SiGen PAB Know-How Deliverables and other Confidential Information provided hereunder and shall, upon request of SiGen, promptly return or destroy all related materials, including SiGen PAB Know-How and all Confidential Information received from SiGen pursuant to this Agreement.   Upon any termination of this Agreement, SiGen shall promptly cease any use of, and shall, upon request of EVG, promptly return or destroy all Confidential Information and related materials received from EVG pursuant to this Agreement.

     11.6.2   For the avoidance of doubt, nothing herein is intended to restrict either party's right generally to conduct its business, including the right to make, sell, use, distribute, or otherwise commercially exploit or exercise any rights whatsoever in respect of Products from and after the effective date of termination of this Agreement or of the License, for whatever reason, subject to Section 11.5.1 and any other terms and conditions that survive the termination of this Agreement.

     11.7    Survival.  Sections 1, 2.5, 4 (subject to Section 4.1.4 and solely with respect to Products sold (i) during the Term or (ii) during the one year period following termination described in Section 11.5.2), 5 (as applicable), 6.1, 6.2, 7-10, 11.4-11.7, and 12 (as applicable) shall survive the expiration or termination of this Agreement.

## 12.    MISCELLANEOUS

     12.1    Governing Law.  This Agreement and any dispute arising from the performance or breach hereof shall be governed by and construed in accordance with the internal laws of the State of California applicable to contracts entered into and performed in California by residents thereof, except in respect of matters arising under patent law, which matters shall be governed by and construed in accordance with Title 35, United States Code, and patent law as interpreted by

Confidential

the U.S. Court of Appeals for the Federal Circuit and the U.S. Supreme Court. In addition the parties submit to the non-exclusive jurisdiction of the courts in and for, Vienna, Austria, and Santa Clara County, California.

12.2    Export. SiGen and EVG shall comply with all applicable laws, including the export control laws of the United States and prevailing regulations which may be issued from time to time by the United States government and those countries involved in transactions concerning the exporting and importing of products and materials, including Products.

12.3    Waiver. Neither party may waive or release any of its rights or interests under this Agreement except in a writing executed by such party. The failure of either party to assert a right hereunder or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition.

12.4    Amendment. This Agreement may be modified or amended only pursuant to a writing executed by both parties.

12.5    Assignment. Except as otherwise provided herein, this Agreement and any license or other rights granted hereunder, shall not be assignable by either party without the prior written consent of the other party, and any attempted assignment shall be null and void *ab initio*. Notwithstanding anything herein, either party may assign this Agreement, together with any license granted hereunder, to a third party that acquires all or substantially all the assets or Control of the party, whether by merger, consolidation, sale, reorganization or otherwise, and provided such assignee assumes in writing all the rights and obligations of the assignor under this Agreement. The terms and conditions of this Agreement shall be binding on and inure to the benefit of the permitted successors and assigns of the parties.

12.6    Notices. All notices, requests and other communications hereunder shall be in writing and shall be personally delivered or sent by facsimile, or international express delivery service, registered or certified mail, return receipt requested, postage prepaid, in each case to the respective address specified below:

<table>
<tr><td>EVG:</td><td>EVG ADDRESS<br>DI Erich Thallner Strasse 1<br>A-4780 Schärding<br>Fax:   +43 7712 5311 1400<br>Attn:  Dr. Peter Podesser</td></tr>
<tr><td>SiGen:</td><td>SiGen ADDRESS<br>Silicon Genesis Corporation<br>61 Daggett Drive<br>San Jose, California 95134, USA<br>Fax:  +1 (408) 228-5859<br>Attn:  Francois Henley</td></tr>
</table>

Confidential

Except for a notice of a change of address, which shall be effective only upon receipt thereof, all such notices, requests, demands, waivers and communications properly addressed shall be effective: (a) if sent by U.S. mail (or if internationally, by air mail), five (5) business days after deposit in the U.S. mail or air mail, postage prepaid; (b) if sent by Federal Express or other overnight delivery service, three (3) business day after delivery to such service; (c) if sent by personal courier, upon receipt; and (d) if sent by facsimile (if the receiving machine confirms receipt through answerback and the sending machine prints a paper copy of the answerback message) upon receipt.

12.7    Force Majeure.  Neither party shall be liable to the other for failure or delay in the performance of any of its obligations under this Agreement for the time and to the extent such failure or delay is caused by earthquake, riot, civil commotion, war, hostilities between nations, governmental law, order or regulation, embargo, action by the government or any agency thereof, act of God, storm, fire, accident, labor dispute or strike, sabotage, explosion or other similar or different contingencies, in each case, beyond the commercially reasonable control of such party. The party affected by Force Majeure shall provide the other party with full particulars thereof as soon as it becomes aware of the same (including its best estimate of the likely extent and duration of the interference with its activities), and shall use its commercially reasonable best endeavors to overcome the difficulties created thereby and to resume performance of its obligations as soon as practicable. If the performance of any obligation under this Agreement is delayed owing to a force majeure for any continuous period of more than six (6) months, the parties hereto shall consult with respect to an equitable solution, including the possible termination of this Agreement.

12.8    Independent Contractors.  Nothing contained in this Agreement is intended implicitly, or is to be construed, to constitute EVG or SiGen as partners in the legal sense. No party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of any other party or to bind any other party to any contract, agreement or undertaking with any third party.

12.9    Advice of Counsel.  SiGen and EVG have each consulted counsel of their choice regarding this Agreement, and each acknowledges and agrees that this Agreement shall not be deemed to have been drafted by one party or another and shall be construed accordingly.

12.10   Other Obligations.  Except as expressly provided in this Agreement or as separately agreed upon in writing between SiGen and EVG, each party shall bear its own costs incurred in connection with the implementation of the obligations under this Agreement.

12.11   Severability.  If any provisions of this Agreement are determined to be invalid or unenforceable by an arbitrator or court of competent jurisdiction, the remainder of this Agreement shall remain in full force and effect without said provision. The parties shall in good faith negotiate a substitute clause for any provision declared invalid or unenforceable, which shall most nearly approximate the intent of the parties in entering this Agreement; provided, if the parties are unable to agree on such a substitute clause and the deletion of the provision held invalid or unenforceable would produce material adverse financial consequences for one party, such party shall have the right to terminate this Agreement with one hundred eighty (180) days notice.

Confidential

12.12   Further Assurances.   At any time and from time to time on and after the Effective Date of this Agreement, either party shall at the request of the other party: (a) deliver to the requesting party such records, data or other documents consistent with the provisions of this Agreement; (b) execute, and deliver or cause to be delivered, all such consents, documents or further instruments of assignment, transfer or license; and (c) otherwise reasonably cooperate as necessary or reasonably useful to give legal effect to the grant of rights granted herein.

12.13   Approvals.   EVG shall be responsible, at its expense, for obtaining any approvals from the governmental entities which may be required under applicable law for the sale of Products.

12.14   Entire Agreement; Superseding Prior Agreements.   This Agreement together with the Exhibits hereto constitutes the entire agreement, both written or oral, with respect to the subject matter hereof, and supersedes all prior or contemporaneous understandings or agreements, whether written or oral, between EVG and SiGen with respect to such subject matter, including specifically the Joint Marketing and Development Agreement dated June 23, 1999 between the parties, except for the provisions contained in such agreement which survive in accordance with its terms as set forth therein, such as the rights and obligations of the parties in respect of ownership of improvements conceived or reduced to practice during the term of the Joint Marketing and Development Agreement.

12.15   Headings.   The headings to the Sections hereof are not a part of this Agreement, but are included merely for convenience of reference only and shall not affect its meaning or interpretation.

12.16   Construction.   Whenever examples are used in this Agreement with the words "including," "for example," "e.g.," "such as," "etc." or any derivation of such words, such examples are intended to be illustrative and not limiting. Words defined in the singular or plural shall have the singular and plural definitions, as applicable and as the context may require.

12.17   Counterparts.   This Agreement may be executed in two counterparts and by facsimile, each of which shall be deemed an original and which together shall constitute one instrument.

12.18   Attorneys' Fees.   The prevailing party in any action brought by either party against the other under this Agreement shall recover its reasonable attorneys' fees incurred in such action, including any appeal.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their authorized representatives effective as of the Effective Date.

-- SIGNATURE PAGE TO FOLLOW --

EV GROUP E. THALLNER GMBH

By: _____

Its: _____

Date of Execution: _____

SILICON GENESIS CORPORATION

By: _____

Its: PRESIDENT AND CEO

Date of Execution: OCTOBER 28, 2003

**EXHIBIT A**
**SiGen PAB Patent Rights**

1. Farrens & al. "In-Situ Plasma Bonding Method"

a. U.S. Patent No. 6,180,496 "In-Situ Plasma Bonding Method"

b. First continuation of U.S. Patent No. 6,180,496 (Issue fee paid and patent to issue)

c. Second continuation of U.S. Patent No. 6,180,496 (Pending)

d. WO 99/10927 "In-Situ Plasma Bonding Method"

e. European Patent Application No. 98 945 799.9 "In-Situ Plasma Bonding Method"


2. Farrens & al. "Method and apparatus for multi-frequency bonding"

a. U.S. Patent Application Serial No. 09/969,550 (20030003684A1) "Method and apparatus for multi-frequency bonding"

Confidential

## EXHIBIT B
## Minimum Requirements for Compatible Products

1.   Bonding System:

Bonding system to be of equal capability to the two EV-850 systems purchased by SiGen under Purchase Order # 2886-1 dated August 31, 2000

2.   Plasma-Activation:

Plasma Activation to meet or exceed the following basic plasma activation operating specifications, such specifications based on the present plasma activation capability installed and operating on the two EV-850 systems purchased by SiGen under Purchase Order # 2886-1 dated August 31, 2000.

Plasma Activation Chamber Operating Specifications (facilities requirements may vary depending on EVG design)

### A.   GENERAL SPECIFICATIONS

| | |
|---|---|
| Substrate size: | 4" to 12" / 100mm to 300mm |
| Thickness (single wafer): | 300-825 um |
| Bond Strength Performance: | Equivalent to SiGen's achievable bond strength on its present EV-850 plasma activated bonders |

### B.   OPERATING CONDITIONS

| | |
|---|---|
| Chamber pressure: | 25-50mT base pressures |
| Wafer temperature: | Ambient (before plasma is turned on) |
| Plasma ON: | 10 to 30 sec |
| RF power: | 0 to 500 W |
| Reflected power: | < 20W |

### C.   FACILITIES REQUIREMENTS

| | |
|---|---|
| RF generators | Power - 198-250 VAC, 50/60Hz, 1 phase 6 amps; |
| | Cooling  - 0.5 GPM minimum facilities water, 20C inlet temperature |
| RF matches: | Power - 100 VAC, 50/60Hz, 1 amp |
| | Cooling – forced air |
| Process gas: | 25 LPM maximum; 8-20 psig |

See also attached description of Plasma Activation Chamber

Confidential



# SiGen

*Leading the Way in Advanced Substrate Technology*

# Plasma Activation Chamber

### Functional Description

The SiGen Plasma activation (PA) chamber dramatically improves wafer-to-wafer bonding through activating the wafer surfaces. The tool takes advantage of the unique properties of an RF plasma to activate bare silicon or oxidized wafers prior to bonding. Plasma Activation offers room-temperature bonding with a bond strength equal to 80% of bulk silicon. A short, relatively low-temperature anneal brings the bond strength to 100% of bulk.

The process chamber is a dual-frequency parallel plate reactor that consists of top and bottom parallel plate electrodes. The top electrode serves as the "source" electrode with the bottom electrode as the "bias" electrode. Each electrode is connected to an RF generator via an RF match. The top lid swings open on a hinge assembly to allow for wafer introduction into and retrieval from the chamber. At the bottom of the chamber body, there are an exhaust port and inlet for process gas. A Mass Flow Controller (MFC) regulates the gas flow. Chamber pressures are read by Convectron and Baratron gauges.

The electronics components are housed in a control rack. The components include: electronics control module, bias RF match, source RF match, source RF generator and bias RF generator. In a standalone or "local" operations mode, the electronics control module controls the PA system operation. The front panel of this control module provides the status of RF, pressure, and gas flow, as well as indicating the roughing and venting cycles. It also contains the control knobs for RF power set points, RF ON/OFF, process time set point and activation cycle ON/OFF.



*The SiGen Plasma Activation Chamber (open in background) is shown here incorporated into an EV850 cluster tool.*



#### General Specifications
| | |
|---|---|
| Substrate size: | 4" to 8" - 100mm to 200mm |
| Thickness (single wafer): | 300-725 um |

#### Operating Conditions
| | |
|---|---|
| Chamber pressure: | 25-50mT base pressures |
| Wafer temperature: | Ambient (before plasma is turned on) |
| Plasma ON | 10 to 30 sec |
| RF power: | 0 to 500 W |
| Reflected power: | < 20W |

#### Facilities Requirements
| | |
|---|---|
| Footprint: | 30" x 36" |
| Clean room: | Class 1 mini-environment |
| Vacuum pump: | BOC Edwards QDP 40 |
| RF generators: | Power - 198-250 VAC, 50/60Hz, 1 phase 6 amps. Cooling – 0.5 GPM minimum facilities water 20C inlet temperature |
| RF matches: | Power - 100 VAC, 50/60Hz, 1 amp Cooling – forced air |
| Process gas: | 25 LPM maximum, 8-20 psig |